# Exhibit 1

# Exhibit 1

| | | |
|---|---|---|
| KEVIN ALSTON | * | IN THE |
| 720 Silver Creek Rd | | |
| Baltimore, Maryland 21208 | * | CIRCUIT COURT |
| | | |
| Plaintiff, | * | FOR |
| | | |
| v. | * | BALTIMORE CITY |
| | | |
| BALTIMORE GAS & ELECTRIC COMPANY, | * | |
| EXELON CORPORATION, EXELON BUSINESS | | |
| SERVICES COMPANY, LLC | * | |
| Serve on Registered Agent: | | |
| Corporate Creations Network Inc. | * | $24 \cdot C \cdot 21 \ 002679$ |
| 2 Wisconsin Circle, #700 | | |
| Chevy Chase, Maryland 20815 | * | JURY TRIAL DEMANDED |
| | | |
| Defendants. | * | |

* * * * * * * * *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kevin Alston ("Mr. Alston"), by and through his undersigned counsel, Tonya

Baña, hereby file this Complaint against Defendants Baltimore Gas and Electric Company ("BGE"

or the "Company"), Exelon Corporation ("Exelon"), and Exelon Business Services Company,

LLC ("BSC") (all collectively, "Defendants"), and in support thereof state as follows:

## NATURE OF THE ACTION

1.      This action involves claims for violations of the Maryland Fair Employment

Practices Act ("MEPA"), Md. Ann. Code, State Gov't §§ 20-601, *et seq.*, 20-1001, *et seq.,* and 20-

1201, *et seq.,* and common law torts arising from Maryland's largest gas and electric utility's

systemic pattern and practice of discriminating against Black utility workers by creating and/or

tolerating a work environment that is objectively hostile to Black employees, subjecting Black

employees to less favorable terms and conditions of employment than their White counterparts,

and retaliating against Black employees who have opposed what they reasonably and in good faith

believed constituted unlawful harassment and/or disparate treatment based on their race. Through

this action, Plaintiff seek declaratory and injunctive relief to prevent Defendants from engaging in further acts of discrimination and retaliation against Plaintiff and other similarly situated individuals in the future and damages for the harm Plaintiff has suffered and continues to suffer as a result of Defendants' unlawful employment practices, including back pay for lost earnings and benefits; interest on backpay; reinstatement or, in lieu of reinstatement, front pay for future lost earnings and benefits; compensatory damages for past and future pecuniary losses, including, but not limited to, out-of-pocket expenses, and non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, injury to professional standing, character, and/or reputation; punitive damages; their reasonable attorneys' fees and costs incurred in the prosecution of this action; and such other and further relief as the Court may deem proper.

## JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction over this action pursuant to Md. Ann. Code, Cts. & Jud. Proc. § 1-501.

3.       The Court has personal jurisdiction over Defendants pursuant to Md. Ann. Code, Cts. & Jud. Proc. § 6-103.

4.       The Circuit Court for Baltimore City is the proper venue for this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201 and § 6-202 and Md. Ann. Code, State Gov't § 20-1202(c)(1) because Defendants regularly carry on business and committed the wrongful actions alleged herein in Baltimore City.

## PARTIES

2

5.      Plaintiff Kevin Alston is a Black or African American male who resides in Baltimore County, Maryland. Mr. Alston was employed by BGE and/or Exelon from November 23, 2015 to January 18, 2019.

6.      Defendant BGE is a corporation organized and existing under the laws of the State of Maryland with its principal place of business located in Baltimore City, Maryland. BGE is a public utility that provides electricity to more than 1.2 million residential customers and gas to more than 650,000 customers in Maryland. BGE employs about 3,100 employees at various locations throughout the State of Maryland. BGE is and at all relevant times was a subsidiary of Exelon.

7.      Defendant Exelon is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located in Chicago, Illinois. Exelon is a public utility holding company that does business in 48 states and the District of Columbia and employs approximately 34,000 people nationwide. Exelon exercises significant control over BGE's employees, including promulgating policies and work rules, employee supervision and discipline, and maintenance of employee records. Exelon also provides BGE with human resources and legal support/oversight through BSC.

8.      Defendant BSC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. BSC is a shared service company that provides a variety of support services, including finance, human resources, information technology, and legal services, to all Exelon subsidiaries, including BGE.

3

## FACTS COMMON TO ALL COUNTS

### BGE's Pattern and Practice of Discrimination and Retaliation Against Black Workers

9.     Throughout Plaintiff's employment with BGE/Exelon, Defendants had a company-wide systemic pattern and practice of discriminating against Plaintiffs and other Black utility workers by (a) perpetuating and/or tolerating blatant racism and racially motivated harassment and disparate treatment that created an objectively hostile and offensive work environment for Black employees; (b) implementing and/or maintaining policies that had the effect of discriminating against Black employees based on their race; and (c) subjecting Black employees to less favorable terms and conditions of employment than their White counterparts with respect to training, assignments, performance evaluation, promotions, compensation, discipline, discharge or constructive discharge, and other terms and conditions of employment.

10.     Defendants also had a widespread systemic pattern and practice of retaliating against Black utility workers who had opposed what they reasonably and in good faith believed constituted unlawful harassment and/or disparate treatment based on their race.

11.     Defendants' unlawful employment practices include, but are not limited to, the practices described in paragraphs 14 to 21 below.

12.     During training and at the various service centers or districts throughout Maryland, BGE's Black utility workers were subjected directly and indirectly to overt race-based harassment and disparate treatment and more subtle microaggressions that evidenced a hostile, undermining, and demeaning view of Black people on an interpersonal, organizational, and cultural level. Through Black employees' own personal experiences and direct observations of the differential treatment of Black and White peers, word of mouth accounts of the racial discrimination experienced by Black coworkers and the preferential treatment afforded to White coworkers, and

4

express directions and/or warnings from their departmental leaders, supervisors, and colleagues advising them to ignore blatant racism, Black employees were indoctrinated into a workplace culture that not only tolerated but perpetuated White supremacist attitudes and behaviors while simultaneously turning a blind eye to or minimizing anti-Black sentiments and conduct.

13.     BGE had a history and a continuing pattern and practice of steering Black applicants and employees to less prestigious assignments with lower earning potential and fewer opportunities for advancement.   Black workers received lesser training opportunities and assignments and spent more time in their current pay grades than their White counterparts.  White workers were assigned to more desirable work locations and/or crews that provided greater opportunities for skills development and increased visibility.  When promotions were made, well-qualified Black employees frequently were not considered or were passed over for positions that were filled with less qualified White employees.  Despite the fact that Blacks increasingly made up a substantial part of BGE's workforce, few crew leader positions were filled by Blacks and crew leader positions were routinely filled by White employees with less relevant experience and seniority than available Black candidates.  Further, assignments were not monitored to ensure equal opportunity for Black workers and, in cases where concerns were raised, no meaningful corrective actions were taken.

14.     Performance evaluations were based largely on the subjective feedback of crew leaders and blindly approved by first line supervisors with little regard for the employee's input. The performance appraisal process permitted crew leaders to offer vague and subjective feedback claiming that an employee's level of performance fell short of established benchmarks without providing any concrete examples to substantiate their opinion, and when racial disparities were pointed out nothing was done to eliminate the discrimination.  Black employees also were

5

disciplined more harshly than similarly situated White employees who engaged in comparable or more serious misconduct. The racially biased evaluations were then directly linked to promotions, salary increases, and bonuses, which further multiplied the discriminatory impact. The cumulative effect of Defendants' discriminatory practices was that Black employees often were paid less than their White counterparts.

15.     Moreover, while White employees who were not performing as expected were often given the opportunity to resign, similarly situated Black employees were usually involuntarily terminated and when Black employees did resign it was often due to a perceived lack of promotional opportunities or morale issues as a result of unlawful discrimination.

16.     Notably, Exelon's corporate policies and practices relating to training, performance evaluation, and discipline, which in turn influenced promotions and pay, served as a framework for overly subjective and racially biased discretionary decisions that perpetuated BGE's racist and retaliatory workplace culture and exacerbated the disparities in how Black and White employees were treated.

17.     Although Exelon had adequate policies and procedures for reporting and investigating unlawful harassment, discrimination, and retaliation, BGE's managers and supervisors frequently failed to carry out their responsibilities to report and address employee complaints of suspected harassing, discriminatory, or retaliatory conduct and BGE's Human Resources personnel often failed to conduct effective investigations and routinely ignored previous complaints made by other employees about the same offender.  Furthermore, when Black employees complained about suspected harassment and/or disparate treatment on the basis of race, instead of properly investigating the alleged discrimination and taking appropriate disciplinary action against the employees implicated in the discrimination, Defendants had a pattern and

practice of placing Black employees who complained about racial discrimination under the authority of Black supervisors, managers, and/or Human Resources personnel, who then managed them out the door.

18.     In sum, as a result of Defendants' discriminatory and retaliatory employment practices, tolerance of race-based harassment and disparate treatment was an express condition of employment for Black utility workers who wished to advance or merely to retain their jobs.

## FACTS SPECIFIC TO KEVIN ALSTON

19.     Mr. Alston was employed by BGE/Exelon as a Gas Mechanic in Gas Emergency Response from November 2015 through January 18, 2019.

20.     At discharge, Mr. Alston was under the immediate supervision of Frank Peusch (White). He previously worked under the supervision of Christopher D'Antoni (White) and Gabe Yori (White).

21.     Mr. Alston's job involved providing emergency service in response to reported gas emergencies, including, but not limited to, inspecting company systems and equipment and customer gas piping and appliances on customer premises, investigating reported gas leaks and taking action to eliminate the hazard, and making repairs. Before BGE summarily discharged him, he had been working for BGE/Exelon for over three years. Throughout his employment, his performance was satisfactory and consistently met BGE's legitimate expectations. He consistently received overall ratings of "b" or "b+" on his midyear and annual performance reviews and he regularly received bonuses in recognition of his performance. Further, his last midyear performance review conducted in or around June or August 2018 reflected that his performance was satisfactory.

7

22.     From the beginning of Mr. Alston's employment with BGE/Exelon, he was subjected to racially offensive and abusive comments and conduct that created a hostile work environment.  After Mr. Alston reported a coworker's use of the "n word," he was subjected to further discrimination and retaliation by, among other things, being denied equal training, subjected to heightened scrutiny and false or exaggerated criticisms and selectively targeted for disciplinary action and, ultimately, discharged for conduct for which similarly situated White employees received lesser or no discipline.

23.     More specifically, during Mr. Alston's initial training at the White Marsh training center, Senior Training Specialist Michael A. Borlie (White) screamed at Mr. Alston and "got in his face" during a seminar.

24.     Mr. Borlie subsequently told Mr. Alston he could arrange for Mr. Alston to receive additional overtime in exchange for not reporting the incident to Human Resources.  Mr. Alston declined Mr. Borlie's offer and requested that Mr. Borlie simply treat him in a professional and respectful manner.

25.     Mr. Alston later learned that a colleague had reported Mr. Borlie's conduct to management.

26.     However, no meaningful disciplinary action was taken against Mr. Borlie.

27.     In or around early 2017 during the second phase of Mr. Alston's training, Mr. Alston reported to the Perry Hall Service Center and primarily did ride-alongs with Gas Mechanic Keith D. Nizer (White).

28.     One time when Mr. Alston was a passenger in Mr. Nizer's vehicle, Mr. Nizer got into a traffic dispute and used the phrase "fucking niggers" in reference to the Black men in the other vehicle.

29.     The next day, Mr. Alston informed Mr. D'Antoni what happened and requested to be reassigned to work with someone else.

30.     Thereafter, Mr. Alston was ostracized by his White coworkers, some of whom openly refused to work with him, and Mr. Nizer and other White coworkers told other employees that Mr. Alston was "lazy" and "sneaky."

31.     For the remainder of Mr. Alston's employment at BGE/Exelon, Mr. Alston was closely monitored and selectively criticized and/or disciplined based on petty and/or provably false accusations.

32.     In particular, in or around March 2018, Mr. Yori coached Mr. Alston for "asking too many questions of dispatch."

33.     In new employee training, workers are specifically taught to have a "questioning attitude," which is supposedly one of BGE's core principles.

34.     In November 2018, Mr. Peusch and Mr. Yori subjected Mr. Alston to a fact-finding investigation and he was subsequently fired without being afforded progressive discipline in January 2019. Mr. Alston's termination letter states that he was discharged because he violated "Employee work conduct and work rules" by allegedly lying about going to a job site and stealing time.

35.     However, during the fact-finding conference, Mr. Alston specifically informed his supervisors that he had objective proof that he reported to the job in question and dispatch contemporaneously verified that he was told to record his hours the way he did.

36.     Following Mr. Alston's discharge, Mr. Alston sought employment with several BGE contractors, but was advised that he had been banned from working on BGE's system for 5 years.

37.     Notably, Mr. Peusch was reassigned from the White Marsh training center to Gas Emergency Response after he was caught using trainees to perform work on his personal residence during work hours.   Following Mr. Peusch's reassignment, his former colleagues at the White Marsh facility discovered that Mr. Peusch had falsified and/or failed to complete years of paperwork required to show that employees fulfilled DOT qualification standards.   Both incidents were swept under the rug.

38.     Mr. Peusch remains employed by BGE/Exelon.

**COUNT I**
**HARASSMENT, DISPARATE TREATMENT, AND RETALIATION**
**IN VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT**
**(On Behalf of Plaintiff Alston Against All Defendants)**

39.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth herein.

40.     Defendants discriminate against Black employees based on their race in violation of the MEPA by perpetuating and/or tolerating racial harassment and disparate treatment that creates an objectively intimidating, hostile or offensive working environment for Black employees, interferes with Black employees' work performance, and has effectively become a condition of continued employment.

41.     Defendants discriminate against Black employees in violation of the MEPA by subjecting them to less favorable treatment with respect to training, discipline, discharge, and other terms and conditions of employment based on their race and by implementing and/or maintaining policies and practices that have the effect of discriminating against Black employees based on their race.

10

42.     Defendants also discriminate against Black employees in violation of the MEPA by retaliating against them for opposing unlawful harassment and/or disparate treatment on account of their race.

43.     Defendants discriminated against Mr. Alston by subjecting him to racial harassment that interfered with his work performance and eventually culminated in adverse action, including, but not limited to, repeated verbal abuse by a White instructor, a White coworker's use of the phrase "fucking niggers" in reference to other Black men in his presence, and his White coworkers' deliberate refusal to work with him and withholding training after he objected to his coworker's use of the "n word" and requested to work with someone else.

44.     Mr. Alston subsequently learned that one of his coworkers reported his instructor's verbal abuse to Human Resources.  Mr. Alston's supervisor reported his coworker's use of the "n word" to Human Resources as well.  That coworker had been disciplined before for using an epithet.  Thus Defendants had actual notice of the demeaning and offensive conduct engaged in by Mr. Alston's White coworkers.

45.     Nevertheless, due to Defendants' failure to correct this persistent pattern or practice of unlawful discrimination, Mr. Alston was denied the right to work in an environment free of racial harassment and the hostile environment and disparate treatment escalated and resulted in him being subjected to further discrimination and/or retaliation by being selectively targeted for heightened scrutiny, disciplined and, ultimately, discharged for pretextual reasons.

46.     Due to Defendants' discriminatory conduct, Mr. Alston has suffered and will continue to suffer harm, including, but not limited to, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, injury to professional standing, character, and/or reputation.

47.    As a result of Defendants' unlawful employment practices, Mr. Alston is entitled to all legal and equitable remedies available pursuant to the Maryland Fair Employment Practices Act, Md. Ann. Code, State Gov't §§ 20-601, et seq., 20-1001, et seq., and 20-1201, et seq.

WHEREFORE, Mr. Alston demands damages in excess of $75,000.00, including compensatory damages, plus prejudgment, the costs and expenses of this suit, and such other and further relief as the Court may deem proper.

Respectfully submitted,

Tonya Bana
129 Slade Avenue
Baltimore, MD 21208
443.890.8000
410.670.7573 (facsimile)
tonya@tonyabana.com

*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby elects a trial by jury of all issues and claims so triable.

DATED this 4th day of June 2020.

Respectfully submitted,

Tonya Bana
129 Slade Avenue
Baltimore, MD 21208
443.890.8000
410.670.7573 (facsimile)

*Attorney for Plaintiff*

12