IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEVIN ALSTON, *et al*.,

     *Plaintiffs*,

     v.                               Civil Action No. ELH-22-1061

BALTIMORE GAS & ELECTRIC
COMPANY, *et al.*,

     *Defendants*.

**MEMORANDUM OPINION**

This employment discrimination case was initially filed in the Circuit Court for Baltimore

City ("Circuit Court" or "State Court") on June 4, 2021, by plaintiff Kevin Alston.  He sued his

former employer, Baltimore Gas & Electric Company ("BGE"); BGE's parent company, Exelon

Corporation ("Exelon"); and an affiliate, Exelon Business Services Company LLC (collectively,

"Exelon Companies").  ECF 2 (Complaint).  Thereafter, on April 8, 2022, Alston, joined by six

former BGE employees, filed a First Amended Complaint (ECF 4, "Amended Complaint"), along

with numerous exhibits.  The Amended Complaint added 36 current and former employees of the

Exelon Companies as defendants.  *Id.*

The Amended Complaint, which is almost 200 pages in length, alleges wide-ranging racial

harassment, discrimination, and retaliation by defendants, resulting in a racially hostile work

environment for Black employees.  *Id.*  It contains eight causes of action, all founded on Maryland

law.  The first four claims arise under the Maryland Fair Employment Practices Act ("FEPA"),

Md. Code (2021 Repl. Vol.), §§ 20-601 *et seq*. of the State Government Article ("S.G.").  In

particular, plaintiffs allege harassment, in violation of S.G. § 20-606(a)(5) (Count I);

discrimination with respect to training, performance evaluation, discipline, promotion and pay,

and discharge/constructive discharge, in violation of S.G. § 20-606(a)(1)(i) (Count II); retaliation,

in violation of S.G. § 20-606(f) (Count III); and discrimination with respect to terms and conditions of employment (5-year work ban), in violation of S.G. § 20-606(a)(1)(i) (Count IV). *See* ECF 4, ¶¶ 612–48. The remaining four counts assert claims under Maryland tort law: tortious interference with economic relations (Count V); intentional infliction of emotional distress ("IIED") (Count VI); defamation (Count VII); and invasion of privacy–false light (Count VIII). *See id.* ¶¶ 649–83.[1] Plaintiffs seek declaratory and injunctive relief; damages for back pay for lost earnings and benefits; interest on back pay; reinstatement or, in the alternative, front pay for future lost earnings and benefits; compensatory damages for pecuniary and nonpecuniary losses, such as emotional pain and suffering, humiliation, and punitive damages; and attorneys' fees. *See id.* ¶ 15.

Following the filing of the Amended Complaint, defendants timely removed the case to this Court, pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446, based on the doctrine of complete preemption. ECF 1 (Notice of Removal). They assert three grounds for removal: (1) jurisdiction under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, for claims that implicate collective bargaining agreements; (2) jurisdiction pursuant to § 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a), for claims relating to the duty of fair representation; and (3) supplemental jurisdiction with respect to the remaining non-federal claims, pursuant to 28 U.S.C. § 1376(a). ECF 1, ¶¶ 11–22.

Plaintiffs have moved to remand (ECF 18, "Remand Motion" or "Motion"), supported by eleven exhibits. Defendants oppose the Motion. ECF 22 (Opposition).[2] The Opposition includes

---

[1] Only Counts I–III are brought by all plaintiffs against all defendants. The remaining Counts are brought by a subset of plaintiffs or a class of plaintiffs against a subset of defendants.

[2] Plaintiffs note that three individual defendants, Chris T. Kasecamp, Joseph M. Belge, and Eric Gomez, have not yet been served. ECF 18 at 2 n.1. Therefore, they did not join the removal, nor have they joined the Opposition.

two exhibits.  Plaintiffs have replied (ECF 26, Reply), supported by another exhibit.[3]

Prior to the filing of the Remand Motion, defendants filed a partial motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6).  ECF 16 ("Motion to Dismiss").  Thereafter, plaintiffs moved to stay or suspend briefing (ECF 19, "Motion to Stay") with respect to the Motion to Dismiss, pending the Court's decision on the Remand Motion.  The Court granted the Motion to Stay, but stated that defendants could move to rescind the Order as improvidently granted.  ECF 20.  Defendants so moved.  ECF 21 ("Motion to Rescind").  The Court denied the Motion to Rescind in a Memorandum (ECF 23) and Order (ECF 24) of August 10, 2022, because the Remand Motion goes to the core issue of the Court's subject matter jurisdiction and, if granted, would render it improper for the Court to resolve the Motion to Dismiss.  *See* ECF 23.

Thus, the issue now before the Court is whether the suit, which alleges racial discrimination, harassment, and retaliation, purportedly under Maryland law, was properly removed from State Court to federal court.  No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Remand Motion.

## I.    Factual and Procedural Background

BGE is the largest natural gas and electrical utility in Maryland.  ECF 4, ¶ 27.  It is also one of the largest employers in Maryland, with approximately 3,200 employees.  *Id.*  Exelon, the largest utility company in the nation, acquired BGE in 2012.  *Id.* ¶¶ 28, 29.  Exelon delivers electricity and natural gas to over 10 million customers in Maryland, Delaware, the District of Columbia, Illinois, New Jersey, and Pennsylvania.  *Id.* ¶ 29.

---

[3] Plaintiffs' Reply was untimely filed.  But, defendants did not move to strike the Reply and no prejudice will result to defendants based on the Court's consideration of the submission.  *See Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 588 (D. Md. 2009) ("The court may, in its discretion, allow an untimely opposition when the delay is short, and the moving party fails to show that it was harmed by the delay.").

Plaintiffs assert that the suit arises from "BGE's companywide and systemic pattern and practice of turning a blind eye to blatant racial harassment and disparate treatment that created a hostile work environment for Black employees" and its "retaliat[ion] against Black employees who opposed unlawful discrimination on account of their race." ECF 18 at 2.[4]  As one example of this conduct, the Amended Complaint alleges that, for over a decade, BGE allowed an instructor to teach trainees how to tie a noose and "to discuss the noose's history," including its use in lynching Black Americans (ECF 4, ¶ 4), even though tying a noose was irrelevant to the job the employees were being trained to perform.  *See id.* ¶ 248 ("The knot Belge showed the trainees was not, and is not, used in Overhead Construction.").

Further, plaintiffs allege that they were "demeaned, mocked, threatened, ostracized and/or harassed and were subjected to heightened scrutiny, unwarranted disciplinary action or criticisms, negative stereotypes, and/or false accusations of misconduct on account of their race or for speaking out against discriminatory practices." *Id.* ¶ 10.  All of the plaintiffs are Black men, and most of them assert that they "personally experienced the use of racial slurs and/or other racially-motivated name-calling in the workplace." *Id.*[5]  Moreover, plaintiffs contend that "supervisors and/or managers . . . turned a blind eye and took no disciplinary action against the perpetrators" and that when such incidents were reported to BGE leadership, the company declined to take serious action.  *Id.*

Of particular importance in this case, Exelon maintains a "Use of Contractors" Human Resources Policy that bars a former employee terminated for cause or poor work performance from

---

[4] Throughout this Memorandum, I cite to the electronic pagination of the parties' filings, which does not always correspond to the page number imprinted on a submission.

[5] The Amended Complaint asserts the use of specific, egregious, and vulgar racial slurs. *See, e.g.*, ECF 4, ¶¶ 10, 68, 119, 175, 176, 288, 340, 420, 442, 443, 444, 447, 534, 543, 604.

working on Exelon projects or property for a period of at least five years after termination.  *See* ECF 4-11, Exelon Use of Contractors Policy, at 9–10.  Five of the six plaintiffs have been subject to this policy, which they allege "effectively forclos[es] them from working for nearly all of the other utility companies in the State of Maryland and, as a practical matter, end[s] their careers in the utility industry."  ECF 4, ¶ 11.[6]  "None of the men . . . have secured comparable employment with another utility company," allegedly due to this policy.  *Id.* ¶ 12.  And, according to plaintiffs, defendants discriminatorily enforce the policy against Black workers; they "have routinely made exceptions in applying [the policy] to similarly situated White former BGE employees."  *Id.* ¶ 637.  As a result of this policy, plaintiffs allege that collectively, they "have been forced to postpone necessary medical procedures and go without the medications required to treat chronic medical conditions"; "are facing foreclosure and have been forced to file bankruptcy"; and have suffered from emotional and physical harms resulting from "race-based traumatic stress, anxiety, depression, humiliation, loss of self-esteem, marital strain, severe emotional distress, sleeplessness, and physiological symptoms."  *Id.* ¶ 12.

Notably, with one exception, plaintiffs are members of the International Brotherhood of Electrical Workers, Local 410 (the "Union" or "Local 410"), which was certified by the National Labor Relations Board as the exclusive representative of over 1,400 of BGE's workers.  *Id.* ¶ 35 n.10.[7]  As of May 24, 2018, prior to ratification of a collective bargaining agreement, BGE and Local 410 entered into an Interim Complaint Procedure (the "ICP"), pertaining to disputes between

---

[6] Plaintiff Quentin Pearson was not subject to the Use of Contractors Policy because Pearson resigned from his employment.  When he tendered his resignation, Pearson specifically cited the discriminatory treatment he experienced "as the primary reason he was choosing to separate from BGE."  *Id.* ¶ 594, 595.

[7] Plaintiff Malik Smith was not covered by the ICP and/or the CBA during his employment with BGE.  ECF 4, ¶ 35 n.10.

BGE and represented employees.  *Id.*  Effective June 23, 2019, BGE and the Union became parties to a Collective Bargaining Agreement (the "CBA").  *Id.*

The Amended Complaint contains allegations that the Union or Union representatives engaged in wrongful conduct and that defendants violated the CBA.  *See, e.g.*, *id.* ¶¶ 43, 53, 86, 160, 235, 236, 238, 378, 394, 396, 404.  Although plaintiffs have named individual Union representatives as defendants, plaintiffs maintain that these representatives have not been sued in their official capacity.  ECF 26 at 13.  Moreover, the Union is not named as a defendant in the case, nor have plaintiffs expressly lodged any claims for relief based on CBA violations or Union wrongdoing.  Rather, plaintiffs allege that the Union representatives named as defendants aided and abetted discrimination and retaliation against plaintiffs.  *Id.*

The claims in the Amended Complaint stand in stark contrast to those Alston brought in a prior suit that came before another member of this court.  *See Alston v. Balt. Gas & Elec. Co. et al.*, SAG-20-2317 ("*Alston I*").  In that case, Alston, the sole plaintiff, filed suit in the Circuit Court against BGE and the Exelon Companies; Local 410; and Patrick Gilden, the Union shop steward.[8] In *Alston I*, Alston alleged wrongful discharge against BGE (Count I); breach of the duty of fair representation against the Union (Count II); breach of contract against BGE and the Union (Count III); false representation against the Union and Gilden (Count IV); and negligent representation against the Union and Gilden (Count V).  *Id.*, ECF 3.  Defendants removed the case federal court. *Id.*, ECF 1.

---

[8] There is a discrepancy regarding the spelling of the Union shop steward's name between the filings in this case and in *Alston I*.  In this case, the Amended Complaint refers to him as "Gildan."  But, I will adopt the spelling of "Gilden," because that is how it is presented in his filings in *Alston I*.  *See Alston I*, SAG-20-2317.

In a Memorandum Opinion and Order of November 12, 2020 (*id.*, ECF 34; ECF 35) Judge Stephanie Gallagher denied Alston's motion to remand (*id.*, ECF 27) and granted the defendants' motions to dismiss (*id.*, ECF 17; ECF 18).  Judge Gallagher found that Counts II and III were preempted by NRLA § 9(a) and LMRA § 301, respectively, making the removal proper and conferring jurisdiction on the court to rule on defendants' motion to dismiss.  *Alston I*, 2020 WL 6684623, SAG-20-2317, at *6–7 (D. Md. Nov. 12, 2020).  And, Judge Gallagher dismissed those claims, with prejudice.  *Id.* at *8.  Judge Gallagher also dismissed Count I with prejudice, finding that it was "subject to the exclusive jurisdiction of the National Labor Relations Board," pursuant to the *Garmon* preemption doctrine.  *See Alston I*, 2022 WL 6684623, at *8 (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)) (explaining that the *Garmon* preemption doctrine dictates that the "NLRB has exclusive jurisdiction to determine whether conduct constitutes an unfair labor practice under the NLRA").  But, of import here, she dismissed the state law tort claims (Counts IV and V) without prejudice, specifically noting that Alston was "free to pursue those claims in state court."  *Id.*

Alston subsequently pursued those claims in the Circuit Court, resulting in the case *sub judice*.  For convenience, I shall sometimes refer to this case as "*Alston II*."

## II.    Legal Standards

### A.  The Contours of Removal

Under 28 U.S.C. § 1441, the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  *Id.* § 1441(a).  Notably, "removal jurisdiction raises significant federalism concerns."  *Mulcahey v. Columbia Organic Chemicals*

*Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)).  Therefore, courts "must strictly construe" removal statutes and resolve all doubts in favor of remanding a case to state court.  *Mulcahey*, 29 F.3d at 151.

The federal courts are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014).  They "may not exercise jurisdiction absent a statutory basis."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  Therefore, a federal court must presume that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper.  *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377).  And, Congress may not confer jurisdiction absent a constitutional basis.  *Shamrock Oil*, 313 U.S. at 108–09 ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution.").

Congress has conferred jurisdiction on the federal courts in several ways.  Of relevance here, Congress has conferred on the district courts original jurisdiction over civil actions that arise under the Constitution, laws, or treaties of the United States, in order to provide a federal forum for plaintiffs who seek to vindicate federal rights.  *See* U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . ."); *see also* 28 U.S.C. § 1331; *Exxon Mobil Corp.*, 545 U.S. at 552.  This is sometimes called federal question jurisdiction.[9]

_____

[9] In addition, "Congress . . . has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens," so long as the amount in controversy exceeds $75,000.  *Exxon Mobil Corp.*,

The burden of demonstrating jurisdiction and the propriety of removal rests with the removing party. *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (Agee, J., concurring in part and dissenting in part); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc); *Mulcahey*, 29 F.3d at 151. Therefore, "[i]f a plaintiff files suit in state court and the defendant seeks to adjudicate the matter in federal court through removal, it is the defendant who carries the burden of alleging in his notice of removal and, if challenged, demonstrating the court's jurisdiction over the matter." *Strawn v. AT & T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). In this way, a failure of proof that jurisdiction exists cuts against the removing party. And, if "a case was not properly removed, because it was not within the original jurisdiction" of the federal court, then "the district court must remand [the case] to the state court from which it was removed." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983) (citing 28 U.S.C. § 1447(c)).

In sum, courts are required to construe removal statutes narrowly. *See Shamrock Oil*, 313 U.S. at 109; *Mulcahey*, 29 F.3d at 151. This is because "the removal of cases from state to federal

---

545 U.S. at 552; *see* 28 U.S.C. § 1332. This is known as diversity jurisdiction. It "requires complete diversity among parties, meaning that the citizenship of *every* plaintiff must be different from the citizenship of *every* defendant." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (emphasis added); *see Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806). Although defendants do not argue otherwise, the Court observes that removal of this case was not based on diversity jurisdiction. Presumably, this is because BGE is domiciled in Maryland. ECF 4, ¶ 18; *see* 28 U.S.C. § 1332; 28 U.S.C. § 1441(b).

Under 28 U.S.C. § 1367(a), district courts are also granted "supplemental jurisdiction over all other claims that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

court raises significant federalism concerns." *Barbour v. Int'l Union*, 640 F.3d 599, 605 (4th Cir. 2011) (en banc) ("*Barbour II*"), *abrogated in part on other grounds by* the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011); *see also Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil*, 313 U.S. 100) ("Because removal jurisdiction raises significant federalism concerns, [courts] must strictly construe removal jurisdiction."). Thus, "any doubts" about removal must be "resolved in favor of state court jurisdiction." *Barbour II*, 640 F.3d at 617; *see also Cohn v. Charles*, 857 F. Supp. 2d 544, 547 (D. Md. 2012) ("Doubts about the propriety of removal are to be resolved in favor of remanding the case to state court.").

## B. Federal Question Jurisdiction

Pursuant to U.S. Const. art. I, § 8, cl. 9, Congress has the power to prescribe the jurisdiction of federal courts.  But, it "may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983).  Article III, § 2, cl. 1 of the Constitution, provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under . . . the Laws of the United States[.]"  And, 28 U.S.C. § 1331 grants federal district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The "propriety" of removal based on federal question jurisdiction "depends on whether the claims 'aris[e] under' federal law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 441 (4th Cir. 2005) (alteration in original) (citation omitted).

A case "can 'aris[e] under' federal law in two ways." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (alteration in original); *see Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).  First, and most commonly, "a case arises under federal law when federal law creates the cause of action asserted." *Gunn*, 568 U.S. at 257; *see also Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) (stating that a "suit arises under the law that creates the cause of action").  Second,

and of relevance here, a claim is deemed to arise under federal law for purposes of § 1331 when, although it finds its origins in state law, "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assurance Inc. v. McVeigh*, 547 U.S. 677, 690 (2006); *see Franchise Tax Bd.*, 463 U.S. at 13.

This latter set of circumstances exists only in a "'special and small category' of cases." *Gunn*, 568 U.S. at 258 (quoting *Empire Healthchoice*, 547 U.S. at 699). Specifically, jurisdiction exists under this category only when "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.*; *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005); *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808–09 (1988); *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 181–82 (4th Cir. 2014).

The "presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see Pressl v. Appalachian Power Co.*, 842 F.3d 299, 302 (4th Cir. 2016). This "makes the plaintiff the master of the claim," because in drafting the complaint, the plaintiff may "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc.*, 482 U.S. at 392; *see Pinney*, 402 F.3d at 442.

However, even when a well-pleaded complaint sets forth a state law claim, there are instances when federal law "is a necessary element" of the claim. *Christianson*, 486 U.S. at 808. Under certain circumstances, such a case may be removed to federal court. The *Pinney* Court explained, 402 F.3d at 442 (internal citation omitted):

Under the substantial federal question doctrine, "a defendant seeking to remove a case in which state law creates the plaintiff's cause of action must establish two elements: (1) that the plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial." If the defendant fails to establish either of these elements, the claim does not arise under federal law pursuant to the substantial federal question doctrine, and removal cannot be justified under this doctrine.

### C.   Federal Preemption of State Law

Defendants contend that removal is proper because plaintiffs' claims, styled as state law causes of action, necessarily implicate federal law and therefore invoke the doctrine of complete preemption.

Before delving into the contours of the complete preemption doctrine, I first address the doctrine of *ordinary* preemption. The doctrines are entirely distinct for the purposes of removal. *See Meade v. Avant of Colo., LLC*, 307 F. Supp. 3d 1134, 1140 (D. Colo. 2018) ("[T]he doctrine of complete preemption should not be confused with ordinary preemption."); *see also Powell v. Huntington Nat'l Bank*, 226 F. Supp. 3d 625, 630 (S.D.W. Va. 2016) ("The linguistic resemblance between complete preemption and ordinary or conflict preemption does not signify a similarly close jurisprudential relationship.").

### 1.   Ordinary Preemption

The doctrine of ordinary preemption is rooted in the Supremacy Clause of the Constitution. The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides that a federal enactment is superior to a state law, so a "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). As a result, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted). "In such circumstances, the state law is preempted and without effect." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 475 (4th Cir. 2014) (internal citation omitted).

Notably, "[f]ederal preemption of state law under the Supremacy Clause—including state causes of action—is 'fundamentally . . . a question of congressional intent.'" *Cox v. Duke Energy Inc.*, 876 F.3d 625, 635 (4th Cir. 2017) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)); *see Beneficial*, 539 U.S. at 9. Congress may manifest its intent in three ways: (1) when it explicitly defines the extent to which its enactment preempts state law (express preemption); (2) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (3) when state law "actually conflicts with federal law" (conflict or impossibility preemption). *English*, 496 U.S. at 78–79. In sum, the ordinary preemption doctrine "regulates the interplay between federal and state laws when they conflict or appear to conflict." *Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012).

Ordinary preemption "occurs when there is the defense of 'express preemption,' 'conflict preemption,' or 'field preemption' to state law claims." *Meade*, 307 F. Supp. at 1140. Thus, ordinary preemption is best characterized as a federal defense. *See Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 186–87 (4th Cir. 2002) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)) ("Under ordinary conflict preemption, state laws that conflict with federal laws are preempted, and preemption is asserted as 'a federal defense to the plaintiff's suit.'"); *Powell*, 226 F. Supp. 3d at 630 (quoting *Caterpillar Inc.*, 482 U.S. at 392) ("Ordinary preemption is a 'defense to the allegations.'"); *Richards v. Appalachian Power Co.*, 836 F. Supp. 2d 436, 439 (S.D. W. Va. 2011) ("[C]onflict preemption is simply a defense to a state-law claim."). Importantly, it is "settled law that a case may *not* be removed to federal court on the basis of a federal defense, *including the defense of pre-emption,* even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc.*, 482 U.S. at 393 (emphasis added); *see Vaden v. Discover Bank*, 556 U.S.

49, 60 (2009).  Therefore, when examining the well-pleaded allegations in a complaint for purposes of removal, a court must "ignore potential defenses."  *Beneficial*, 539 U.S. at 6.

Put another way, the "existence of a federal defense normally does not create statutory 'arising under' jurisdiction, and 'a defendant [generally] may not remove a case to federal court unless the *plaintiff's* complaint establishes that the case "arises under" federal law.'"  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004) (emphasis in original) (alteration in *Davila*) (internal citations omitted) (quoting *Franchise Tax Bd.*, 463 U.S. at 10).  Thus, if the basis for preemption "does not appear on the face of a well-pleaded complaint," it is a defense, and "therefore, does not authorize removal to federal court."  *Taylor*, 481 U.S. at 63; *see Pinney*, 402 F.3d at 449.

### 2.  Complete Preemption

In contrast to ordinary preemption, a case *is* removable from state court to federal court based on the doctrine of complete preemption.

The complete preemption doctrine is a "corollary of the well-pleaded complaint rule." *Taylor*, 481 U.S. at 63; *see In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 584 (4th Cir. 2006).  It exists where Congress "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Taylor*, 481 U.S. at 63–64.  The Supreme Court has explained: "When [a] federal statute *completely* pre-empts [a] state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."  *Beneficial*, 539 U.S. at 8 (emphasis added).  Therefore, federal question jurisdiction is satisfied "when a federal statute wholly displaces the state-law cause of action through complete pre-emption."  *Id.*; *see Vaden*, 556 U.S. at 61; *Davila*, 542 U.S. at 207–08.

The complete preemption doctrine "recognizes that some federal laws evince such a strong federal interest that, when they apply to the facts underpinning the plaintiff's state-law claim, they convert that claim into one arising under federal law." *In re Blackwater*, 460 F.3d at 584.  Indeed, complete preemption is a jurisdictional doctrine that "'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc.*, 482 U.S. at 393 (quoting *Taylor*, 481 U.S. at 65); *see Pinney*, 402 F.3d at 449; *see also Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005) (noting that the complete preemption doctrine is an "exception" to the well-pleaded complaint rule); *Hannibal v. Fed. Express Corp.*, 266 F. Supp. 2d 466, 469 (E.D. Va. 2003) (observing that, where the defendant argued that removal was proper because the plaintiff's contract claim was governed exclusively by federal common law, the defendant attempted "to argue that federal common law completely preempts" the plaintiff's state breach of contract claim); *Goepel v. Nat'l Postal Mail Handlers Union, a Div. of LIUNA*, 36 F.3d 306, 311–12 (3d Cir. 1994) (internal citation omitted) ("[T]he only state claims that are 'really' federal claims and thus removable to federal court are those that are preempted completely by federal law.").

In sum, the doctrine dictates "there is 'no such thing' as the state action, since the federal claim is treated as if it appears on the face of the complaint because it effectively displaces the state cause of action." *Lontz*, 413 F.3d at 441 (quoting *Beneficial*, 539 U.S. at 11).  But, in order for a court to find that a state law claim is completely preempted, "exacting standards" must be satisfied.  *Lontz*, 413 F.3d at 441.  To remove an action on the basis of complete preemption, a defendant must show that Congress intended for federal law to provide the "exclusive cause of action" for the claim asserted.  *Beneficial*, 539 U.S. at 9; *see Barbour II*, 640 F.3d at 631 (Agee, J., concurring).

The Fourth Circuit recognizes a presumption against complete preemption, and it may only be rebutted in the rare circumstances where "federal law . . . 'displace[s] entirely any state cause of action.'" *Lontz*, 413 F.3d at 440 (alteration in *Lontz*) (quoting *Franchise Tax Bd.*, 463 U.S. at 23). "To rebut the presumption against complete preemption, a defendant must demonstrate that 'Congress'[s] intent in enacting the federal statute at issue' was to extinguish the state-law claim." *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 212 (4th Cir. 2021) (alteration in *Skidmore*) (quoting *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 738 (1985)). The defendant is required to show that: "(1) the preempting statute displays a clear congressional intent to 'entirely displace' state law; and (2) the preempting statute creates an exclusive federal cause of action in an area of 'overwhelming national interest.'" *Id.* (quoting *Lontz*, 413 F.3d at 441).

Complete preemption is rare. To my knowledge, "the Supreme Court has, in fact, found complete preemption in regard to only three statutes." *Mayor & City Council of Balt. v. BP P.L.C.*, 388 F. Supp. 3d 538, 561 (D. Md. 2019), *as amended* (June 20, 2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *vacated and remanded*, ___ U.S. ___, 141 S. Ct. 1532 (2021), *aff'd*, 31 F.4th 178 (4th Cir. 2022); *see Beneficial*, 539 U.S. at 10–11 (National Bank Act); *Taylor*, 481 U.S. at 65–67 (ERISA § 502(a)(1)(B)); *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 559–60 (1968) (LMRA § 301). This is unsurprising because the doctrine represents a significant departure from the general rule that the plaintiff is "the master" of his claim, and "may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc.*, 482 U.S. at 392; *see also Lontz*, 413 F.3d at 441 (noting that complete preemption "undermines the plaintiff's traditional ability to plead under the law of his choosing"). But, of relevance here, one of the statutes is LMRA § 301.

### III.    Removal Discussion

As mentioned, a court must "construe removal strictly," such that "reasonable doubts must be resolved against the complete preemption basis for it." *Lontz*, 413 F.3d at 441.  Again, "removal jurisdiction raises significant federalism concerns." *Mulcahey*, 29 F.3d at 151.  "If federal jurisdiction is doubtful, a remand is necessary." *Id.*

### A. Section 301 of the LMRA

Defendants contend that plaintiffs' claims, all of which are framed as state law causes of action, are completely preempted pursuant to § 301 of the LMRA, 29 U.S.C. § 185.  Specifically, defendants note that § 301 "completely preempts state law claims which seek to enforce collective bargaining agreements or whose resolution are substantially dependent upon an analysis of such an agreement."  ECF 1, ¶ 13.  And, they contend that "[n]umerous paragraphs in the Amended Complaint make allegations that require interpretation of the CBA, seek to enforce the CBA, allege violations of the CBA, or otherwise depend on the CBA."  *Id.* ¶ 16.  They cite to ¶¶ 43, 53, 86, 160, 235, 236, 238, 378, 394, 396, and 404 of the Amended Complaint.  ECF 1 at 6.

Congress enacted the LMRA in 1947 as an amendment to the National Labor Relations Act ("NLRA").  *See Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 754–55 (1988).  In doing so, Congress intended for federal law to govern labor relations in order to protect unions, the collective bargaining process, and to stabilize employee access to a unionized workplace.  *See* 29 U.S.C. § 141.  Congress recognized that "[i]ndustrial strife" often "interferes with the normal flow of commerce," which could be "substantially minimized" by uniform application of labor law.  *Id.* This desire for uniform application of labor law is manifested in § 301 of the LMRA, which grants original jurisdiction to federal courts as to claims within its scope.  It states, 29 U.S.C. § 185:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this

chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The Supreme Court has interpreted § 301 to be broader than a simple grant of federal jurisdiction; it has held that the statute permits courts to create federal common law. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 451 (1957) (holding that § 301 "authorizes federal courts to fashion a body of federal law for the enforcement of [CBAs]"). Moreover, the Supreme Court has determined that § 301 requires federal courts to apply federal law exclusively—that is, to apply the doctrine of complete preemption—to all lawsuits with claims that fall within § 301's mandate. *See Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962).

Initially, the Court's application of § 301 preemption was narrow—it applied to lawsuits alleging a contractual breach of a collective bargaining agreement. *See id.* at 103 (reasoning that "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements"). Together, *Lincoln Mills* and *Lucas Flour* indicated that state law was preempted only within the context of disputes to enforce provisions of a CBA.

But, the Supreme Court continued to expand the scope of § 301 and applied the doctrine of complete preemption to certain state law tort claims. *See generally Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985). Because § 301 preempted state lawsuits charging breach of a CBA, the Court reasoned that state law tort claims must also be preempted when they are essentially contract claims. *See id.* at 211 ("[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.").

-18-

Thus, when an employee covered by a CBA brings tort claims against an employer, the question becomes whether it is a "real" tort claim or a "disguised" tort claim, *i.e.*, one that is, in reality, a claim for breach of the CBA. The Court has termed the latter to be a "tortious breach-of-contract" claim. *See Int'l Bhd. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 861 (1987). The reviewing court must therefore determine whether a tort claim is actually a "tortious breach-of-contract" claim, such that it falls within the scope of § 301. *Id.* at 859 ("Inasmuch as federal law must control the uniform meaning given to contract terms in a collective-bargaining agreement . . . an employee's state-law tort action that necessarily rests on an interpretation of those terms is pre-empted by § 301.").

However, to determine whether complete preemption applies to state law claims, a court may only consider the nature of the claims asserted in a plaintiff's complaint. *See Caterpillar Inc.*, 482 U.S. at 398–99; *see also Harless v. CSX Hotels, Inc.*, 389 F.3d 444, 450 (4th Cir. 2004) (finding that claims were not preempted by § 301 because a federal question was not presented on the face of the plaintiff's complaint); *Humble v. Boeing Co.*, 305 F.3d 1004, 1008 (9th Cir. 2002) ("[T]he plaintiff's claim is the touchstone for the preemption analysis."). Although a defendant may assert a complete preemption defense, it is the substance of the plaintiff's claims that determines whether § 301 preemption applies. The Supreme Court explained in *Caterpillar Inc.*, 482 U.S. at 398–99 (emphasis in original):

> [T]he presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court. When a plaintiff invokes a right created by a collective-bargaining agreement, the plaintiff has *chosen* to plead what we have held must be regarded as a federal claim, and removal is at the defendant's option. But a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the

claim shall be litigated.  If a defendant could do so, the plaintiff would be master of nothing.

The Supreme Court created a two-part test in *Caterpillar Inc.* to determine the doctrine of complete preemption applies.  Pursuant to this test (the "*Caterpillar* Test"), a reviewing court must ascertain: (1) whether the right or duty alleged in the complaint is created by the CBA, rather than existing independently of the labor agreement; or (2) whether any element of the state law claim is "substantially dependent" on the interpretation of a term or provision in the CBA, such that its interpretation is required to resolve the claim.  *Id.* at 394 (citations omitted).  If either of these two inquiries is answered affirmatively, the claim is preempted by § 301.  Yet, as the Second Circuit has observed, courts have found that "[t]he principles for deciding when a state-law claim is preempted by the LMRA are more easily expressed than applied."  *Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 233 (2d Cir. 1997).

### 1.   The *Caterpillar* Test

Under the *Caterpillar* Test, the threshold inquiry for a court to assess is whether the claim, on its face or by necessity, alleges a right or duty that is "without existence independent of the [CBA]" or created by the CBA.  *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 371–72 (1990) (citing *Hechler*, 481 U.S. at 859–60).

The Supreme Court's decisions in *Hechler*, 481 U.S. 851, and *Rawson* 495 U.S. 362, are instructive as to the analysis at this juncture.  In both *Hechler* and *Rawson*, employees sued their unions for alleged breach of a duty to ensure safe working conditions.  But, the Court recognized in both cases that the common law does not impose this duty on unions.  *Rawson*, 495 U.S. at 369–70; *Hechler*, 481 U.S. at 859–60.  The *Hechler* Court explained, 481 U.S. at 859 (emphasis in original): "Under the common law, . . . it is the *employer*, not a labor union, that owes employees a duty to exercise reasonable care in providing a safe workplace."

Thus, in order to be subject to this duty, the union must have assumed it through contract, and to assess the union's tort liability, a court "would have to ascertain first, whether the [CBA] in fact placed an implied duty of care on the Union . . . and, second, the nature and scope of that duty." *Id.* at 861–62. Because "'questions of contract interpretation . . . underlie any finding of tort liability,'" the Court reasoned, the claims were preempted by § 301. *Id.* at 862 (quoting *Lueck*, 471 U.S. at 218); *see Rawson*, 495 U.S. at 371 ("If the Union failed to perform a duty in connection with inspection, it was a duty arising out of the collective-bargaining agreement.").

If, as here, the tort suit is brought against the employer, scrutiny is required, because certain duties are imposed on employers by the common law, independent of a CBA. And, with respect to the first prong of the *Caterpillar* Test, preemption is not appropriate where the claim alleges independent state law rights or duties. *See Foy*, 127 F.3d at 235 ("An employee's nonnegotiable right to sue under state law, based on promises that go beyond a CBA, is not automatically or necessarily preempted solely because the CBA provides for lesser or other rights than what the employee claims to have been promised. . . . State law—not the CBA—is the source of the rights asserted by plaintiffs."). Thus, the first step of the analysis is limited; it inquires only whether the right or duty alleged is defined by the CBA. If the plaintiff can plausibly argue that the right or duty allegedly violated is derived from independent state grounds, and is not derived solely from the CBA, a court must look to the second step of the *Caterpillar* Test.

The second step is more difficult to apply. It focuses on whether the court will necessarily have to interpret the CBA in order to resolve the plaintiff's claim.

In *Lueck*, 471 U.S. at 206, the foundational case for the second step of this test, the plaintiff-employee alleged that the defendant-employer violated a state law duty of good faith in processing his disability benefits claims. The Court determined that the claim was completely preempted by

§ 301 because the specific tort was "firmly rooted" in questions of contract interpretation. *Id.* at 217–18. The Court said, *id.* at 218: "Because the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation." In sum, "[i]f the state tort law purports to define the meaning of the contract relationship, that law is pre-empted." *Id.* at 213.

The Supreme Court distilled this analysis in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988), and *Livadas v. Bradshaw*, 512 U.S. 107 (1994). In *Lingle*, 486 U.S. at 399, the plaintiff-employee sought workers' compensation and was fired for filing an allegedly false claim. The plaintiff was covered by a CBA that contained a provision protecting workers from discharge except for cause and, in addition to filing a grievance pursuant to the CBA, brought a claim of retaliatory discharge against the employer in state court under state law. *See id.* at 401–02. The Court held that the state law remedy for retaliatory discharge was independent of the CBA because the resolution of that claim did not require the Court to construe the CBA. *Id.* at 407. It reasoned, *id.* at 409–10:

> [Section] 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements.[] In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

This principle was reaffirmed in *Livadas*, 512 U.S. at 124–25, in which the Court similarly declined to apply the complete preemption doctrine. The *Livadas* Court clarified that preemption is not supported simply because a CBA must be referenced in adjudicating the merits of that claim. It said, *id.* at 123–24 (emphasis added):

> In *Lueck* and in [*Lingle*] . . . we underscored the point that § 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a

matter of state law, [] and we stressed that it is the legal character of a claim, as "independent" of rights under the collective-bargaining agreement . . . (and not whether a grievance arising from "precisely the same set of facts" could be pursued. . .) that decides whether a state cause of action may go forward. [] Finally, we were clear that when the meaning of contract terms is not the subject of dispute, *the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished*.

Further, the Court determined that § 301 preemption should be applied only when it is done to further the purposes of the LMRA—that is, to ensure uniform application of labor law, so that state law is not determinative of interpretation or enforcement of a CBA. *Id.* at 122–23. It added that an additional purpose of § 301 preemption is to assure that parties do not "renege on their arbitration promises by 'relabeling' as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements." *Id.* at 123.

In sum, the Supreme Court found that complete preemption could not apply to claims "rooted in nonwaivable rights ostensibly secured by state law to all employees." *Id.* at 134. It reasoned that federal labor law "does not require such a heavy-handed policy, and, indeed, cannot permit it." *Id.*

### 2.   The Missing CBA

As noted, plaintiffs assert eight claims in the Amended Complaint, four of which are brought pursuant to the Maryland Fair Employment Practices Act, S.G. §§ 20-601 *et seq.*, and four of which are state law tort claims. Before I assess each claim, I pause to note that I must do so without reviewing the CBA. This is because the parties have not provided the Court with a copy of it. Defendants provided only a redacted copy of the CBA's table of contends. ECF 22-1.

As I see it, the failure to submit the CBA constitutes a striking omission. This is because in much of the case law in this area, in cases finding for and rejecting preemption arguments, courts look to the relevant CBA to determine whether there is a provision within the document that governs the issue in dispute. *See, e.g., Verbal v. Giant of Md., LLC*, 204 F. Supp. 3d 837 (D. Md.

2016); *Dockery v. Martz Grp./Gold Line, Inc.*, MAB 14-CV-02455, 2015 WL 3465902 (D. Md. May 14, 2015); *Ali v. Giant Food LLC/Stop & Shop Supermarket Co., LLC*, 595 F. Supp. 2d 618 (D. Md. 2009); *Kline v. Sec. Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004); *Rawson*, 495 U.S. 366 (referencing a specific provision of the CBA); *Willis v. Reynolds Metals, Co.*, 840 F.2d 254 (4th Cir. 1988); *Tellez v. Pac. Gas & Elec. Co.*, 817 F.2d 536 (9th Cir. 1987).

The party seeking removal bears the burden of establishing federal jurisdiction.  *See Mulcahey*, 29 F.3d at 151; *see also Scott v. Cricket Comms., LLC*, 865 F.3d 189, 195–96 (4th Cir. 2017) (noting that, upon a motion to remand, the defendant bears the burden to prove jurisdiction). Therefore, a failure of proof weighs against defendants.  In litigating the issue of removal without providing the Court with the CBA, defendants essentially ask that I speculate about the provisions contained in the CBA.  In effect, they ask me to assume that plaintiffs have pursued claims that require interpretation of the CBA.

That a court may refer to a CBA to determine its scope does not itself imply that a court is required to interpret the CBA, thereby implicating § 301 preemption.  *See Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1109–10 (9th Cir. 2000) (declining to apply preemption when "[a] court may be required to read and apply these provisions . . . but no interpretation of the provisions would be necessary"); *see also Tellez*, 817 F.2d at 538 (referencing the scope of a CBA's provisions to determine that the claim did not require CBA interpretation); *Kline*, 386 F.3d at 256 ("[T]he mere fact that we must look at the CBA in order to determine that it is silent on any issue relevant to Appellants' state claims does not mean that we have 'interpreted' the CBA."). And, notwithstanding the parties' failure to provide the Court with a copy of the CBA, I am satisfied that interpretation of the CBA is not implicated here.

This case is also notable for the extensive content included in the Amended Complaint.  As I have discussed, plaintiffs lodge allegations of CBA violations and Union wrongdoing throughout the document, although they have not sued the Union, and they contend that their asserted claims for relief do not depend on all of the allegations in the suit.  Essentially, they suggest that the information provides context for the claims; at worst, it is superfluous.

In my view, plaintiffs included unnecessary information that complicated what would otherwise be a fairly simple analysis.  By including so much detail, plaintiffs handed defendants a red herring to waive before the Court, and defendants artfully did so.  "Thus, in the particular jurisdictional minuet danced by the parties here, this Court is faced with an irrelevancy, which has been controverted by a non-sequitur." *Prevas v. Checkmate Investigative Servs., Inc.*, 951 F. Supp. 568, 569 n.2 (D. Md. 1996).

Again, it is the *substance* of plaintiffs' claims that determines whether § 301 preemption applies, rather than the arguments implicated by a defense to those claims.  *See Caterpillar Inc.*, 472 U.S. at 398–99.  "It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide whether the state claim survives.  But the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule." *Id.* at 398.  To determine whether plaintiffs' claims are subject to the complete preemption doctrine, I must center my analysis on the Amended Complaint and the claims actually asserted.  *See id.*; *see also Humble*, 305 F.3d at 1009 ("[T]he plaintiff's claim is the touchstone for the preemption analysis, and 'the need to interpret the CBA must inhere in the nature of the plaintiff's claim' to trigger preemption.") (quoting *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683 (9th Cir. 2001)).

Therefore, the analysis that follows dissects the claims brought by plaintiffs and seeks to determine if CBA interpretation is *necessary* on the face of those claims. But, "a CBA provision does not trigger preemption when it is only *potentially* relevant to the state law claims, without any guarantee that interpretation or direct reliance on the CBA terms will occur." *Humble*, 305 F.3d at 1009.

### 3.   The Claims for Relief

#### a.   FEPA Claims

As noted, plaintiffs bring four claims under FEPA: harassment, in violation of S.G. § 20-606(a)(5) (Count I); discrimination with respect to training, performance evaluation, discipline, promotion and pay, and discharge/constructive discharge, in violation of S.G. § 20-606(a)(1)(i) (Count II); retaliation, in violation of S.G. § 20-606(f) (Count III); and discrimination with respect to terms and conditions of employment (5-year ban), in violation of S.G. § 20-606(a)(1)(i) (Count IV). *See* ECF 4, ¶¶ 612–48. The rights alleged by plaintiffs in Counts I through IV are independent of a CBA and therefore cannot be preempted by Section 301 of the LMRA, 29 U.S.C. § 185.

FEPA specifies, in pertinent part: "An employer may not . . . (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's race [or] color." S.G. § 20-606(a)(1)(i). It also bars employers from "engag[ing] in harassment of an employee." S.G. § 20-606(a)(5). Additionally, FEPA includes an anti-retaliation provision, which states: "An employer may not discriminate or retaliate against any of its employees . . . because the individual has: (1) opposed any practice prohibited by this subtitle; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle." S.G. § 20-606(f).

As an initial matter, the rights asserted in these counts are not created by the CBA, but rather from state law prohibiting racial discrimination, harassment, and retaliation. Therefore, the claims are not preempted under the first prong of the *Caterpillar* Test.

Moving to the second step in the *Caterpillar* Test, the claims arising under FEPA are independent of the CBA. The *Lueck* Court, 471 U.S. at 213, defined those state law rights and duties that "do not exist independently of private agreements" as ones that *can* be waived or altered by agreements between private parties. Thus, rights that *cannot* be waived or altered by contract are independent of a CBA and are not subject to § 301 preemption. Indeed, "§ 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. . . it would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.* at 212. Moreover, the Supreme Court emphasized in *Livadas*, 512 U.S. at 123, that "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." The fact that a CBA may enforce duties that parallel those required under state law does not alter the characterization of the state law rights as "independent" of the CBA for the purposes of a preemption analysis. *See Humble*, 305 F.3d at 1009 (holding that a reasonable accommodation claim was not preempted simply because a CBA covered the subject matter in dispute).

It is clear that the rights of employees to exist in a workplace free of racial discrimination, harassment, and retaliation are rights that cannot be waived in a labor agreement. *See Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1338 (6th Cir. 1989) (Kennedy, C.J., concurring in part) ("The right to be free of race sex, or age discrimination is independent of any ancillary right contained in a collective bargaining agreement."). These rights typify those that exist "independently" of

private agreements.  The purpose of FEPA is to "prohibit discrimination in employment by any person."  S.G. § 20-602.  And, "[w]hen a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA [as amended by the LMRA], it conflicts with none of the purposes of the Act."  *Metro. Life Ins.*, 471 U.S. at 757.  It would "turn the policy that animated the [NLRA] on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefitting from state labor regulations imposing minimal standards on nonunion employers."  *Id.* at 756.  Thus, § 301 does not preempt state law claims of racial discrimination, harassment, and retaliation.

Further, no elements of a FEPA claim require reference to or interpretation of a CBA. "There are relatively few appellate decisions interpreting Maryland's FEPA," so courts in the state have been guided by federal courts' interpretation of Title VII to analyze claims under the state's analogue law.  *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 209, 137 A.3d 211, 217–18 (2016); *see Schwenke v. Ass'n of Writers & Writing Programs,* 510 F. Supp. 3d 331, 335 (D. Md. 2021).

The elements of a FEPA discrimination claim require a plaintiff to demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly situated employees outside of the plaintiff's class received more favorable treatment.  *Alexander v. Marriott Int'l, Inc.*, RWT-09-2402, 2011 WL 1231029, at \*6 (D. Md. Mar. 29, 2011).

For a FEPA retaliation claim, plaintiffs must show that: (1) they engaged in a protected activity; (2) the employer acted adversely against them; and (3) there was a causal connection between the protected activity and the adverse action.  *Barreto v. SGT, Inc*., 826 F. App'x 267, 271 (4th Cir. 2020) (citation omitted).  And, a claim for racial harassment requires a showing that:

(1) plaintiffs experienced unwelcome harassment; (2) the harassment was based on their race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019).

When a state law claim depends on "purely factual" questions regarding the employee's conduct and/or the employer's conduct and motive, a CBA need not be interpreted, and the claim is therefore not preempted by § 301. *See Lingle*, 486 U.S. at 407 (concerning a state law claim of retaliatory discharge); *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 262 (1994) (same). As in *Lingle* and *Hawaiian Airlines*, the elements of a discrimination, retaliation, and/or harassment claim under FEPA "pertain to the conduct and motivation of the employer under statutory standards, rather than the standards of the CBA." *Knox v. Wheeling-Pittsburgh Steel Corp.*, 899 F. Supp. 1529, 1534 (N.D. W.Va. 1995); *see also Hejda v. Bell Container Corp.*, 450 N.J. Super. 173, 191–92, 160 A.3d 741, 750–51 (2017) (finding that the elements of a retaliation claim are a purely factual inquiry and therefore require no interpretation of a CBA). Although *Lingle* does not go so far as to hold that every claim for retaliatory discharge, or otherwise similar claim, will avoid preemption under § 301, "it suggests that preemption will be rare." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 801 (7th Cir. 2013).

In opposition to plaintiffs' Remand Motion, defendants argue: "One of the overarching and expressly stated themes of the Amended Complaint is that Black employees were subject to disparate treatment . . . in the administration of the CBA." ECF 22 at 24. Moreover, defendants contend that "*all* of the foregoing claims are substantially dependent on analysis of the CBA or ICP to determine what rights were allegedly violated." *Id.* at 25 (emphasis in original). Notably,

however, defendants do not point to any specific provision within the ICP or CBA that govern the present dispute, nor do they rely on any CBA provision as authorizing the alleged conduct.[10]

As defendants observe, the Amended Complaint contains alleged violations of the CBA. But, the claims for relief are not founded on a violation of the CBA. Plaintiffs neither dispute the meaning of terms in the CBA nor bring claims for wrongful discharge in violation of the CBA. Rather, plaintiffs charge defendants with racial discrimination, in violation of state law, and make reference to the CBA in doing so.

Defendants cite to ¶ 160 of the Amended Complaint. ECF 22 at 24. It alleges: "Black employees . . . were deprived of access to the remedies available under the ICP and/or the CBA because Union representatives deliberately failed to timely file complaints or grievances on [plaintiffs'] behalf and/or because Local 410 and/or Defendants failed to follow the steps outlined in the ICP and/or the CBA." ECF 4, ¶ 160. Although plaintiffs invoke CBA procedures, the allegation illustrates actions of defendants that were *motivated by race*. Simply put, analysis of the CBA is not required to resolve the claim that plaintiffs were treated differently on account of their race.

As another example, defendants contend (ECF 22 at 25) that the Amended Complaint "expressly seeks to enforce the CBA," citing ¶ 236. There, plaintiffs allege that defendants "did not follow *any* of the steps" outlined in the ICP. ECF 4, ¶ 236 (emphasis in original). But, again, the allegation made in ¶ 236 is not the claim for relief. The FEPA claim instead asserts that defendants discontinued processing Alston's appeal of discharge *because of his race*. Although

---

[10] It is possible that, in their defense on the merits of plaintiffs' claims, defendants will rely on CBA provisions to offer a non-discriminatory justification for their conduct. But, this is not sufficient to invoke the doctrine of complete preemption. *See Humble*, 305 F.3d at 1011–12 ("[R]eliance on CBA provisions to defend against an independent state law claim does not trigger section 301 preemption.")

the Amended Complaint references a failure to follow procedures set out in the labor contract, it does not assert that BGE discharged an employee in violation of the contract, nor does it ask the Court to interpret or enforce the CBA. *See id.*  In other words, the Court is not required to discern whether BGE violated the CBA.  To resolve the FEPA claim, the question is whether defendants' conduct was motivated by race, and "the resolution of the question of why [plaintiff] was discharged does not involve interpretation of the CBA." *Owen v. Carpenters' Dist. Council*, 161 F.3d 767, 776 (4th Cir. 1998) (finding that LMRA § 301 did not preempt plaintiff's claim that she was fired because she rebuffed her supervisor's sexual advances and complained of the harassment); *see also Smolarek*, 879 F.2d at 1334 (finding that the question of motivation for adverse employment actions is "a factual one" and thus "sufficiently 'independent' of the collective bargaining agreement to escape § 301 preemption").  Indeed, "[t]he Supreme Court and [the Fourth Circuit] have recognized that Section 301 does not preempt a claim alleging discriminatory discharge when, as here, the claim turns on the employer's motivation for firing the plaintiff, a question of fact that does not depend on an interpretation of the CBA." *Harless*, 389 F.3d at 449 (citing *Lingle* 486 U.S. at 407; *Owen*, 161 F.3d at 775).

Moreover, plaintiffs' FEPA claims do not dispute any provisions of the CBA.  "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas*, 512 U.S. at 124; *see also Lingle*, 486 U.S. at 413 n.12 ("A collective-bargaining agreement may, of course, contain information . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled.").  Thus, plaintiffs' mere reference to the CBA does not compel a finding of complete preemption.

In sum, plaintiffs' claims are not breach of contract claims "disguised" as discrimination claims. Plaintiffs do not seek to enforce the CBA, nor do they pursue relief under the theory that their rights under the Union-negotiated labor contracts were violated. Rather, plaintiffs seek to enforce their rights under Maryland law to be treated in the same manner as their white counterparts. Plaintiffs' status as unionized employees affords them certain rights; it does not strip them from base-line protections. Indeed, "[i]t would further few of the purposes of the [NLRA and LMRA] to allow unions and employers to bargain for terms of employment that state law forbids employers to establish unilaterally," because that would "'delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored.'" *Metro. Life Ins.*, 471 U.S. at 755 (quoting *Lueck*, 471 U.S. at 212).

In other words, plaintiffs pursue relief on the theory that defendants' treatment of them violated their *state law* rights to equality. *See generally* ECF 4. As the *Lingle* Court pronounced, 486 U.S. at 409–10, "if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Such is the case at bar.

To be sure, the same facts alleged by plaintiffs in this matter may have been used to support claims of contract violations. But they were not. To the contrary, they were employed to support claims for disparate treatment on the basis of race and are thereby not preempted by § 301. To hold otherwise would contradict the well-pleaded complaint rule and leave plaintiffs as the "master of nothing." *Caterpillar Inc.*, 482 U.S. at 398–99.

#### b.  State Tort Claims

The Amended Complaint includes four tort claims under Maryland law: tortious interference with economic relations (Count V); intentional infliction of emotional distress ("IIED") (Count VI); defamation (Count VII); and invasion of privacy–false light (Count VIII). *See* ECF 4, ¶¶ 649–83.  These claims are not subject to preemption under Section 301 of the LMRA.

In general, "[s]tate tort claims are preempted where reference to a collective bargaining agreement is necessary to determine whether a 'duty of care' exists" or to define the scope of that duty. *McCormick v. AT & T Techs., Inc.*, 934 F.2d 531, 536 (4th Cir. 1991) (citing *Hechler*, 481 U.S. at 862).  But, "[i]n the absence of a material dispute about the meaning of [specific provisions] of the CBA, the need to refer to those provisions in order to evaluate defendants' conduct is insufficient to require preemption of plaintiff's state law claims." *Lawton v. United Parcel Serv., Inc.*, 338 F. Supp. 2d 347, 350 (D. Conn. 2004).  Further, as discussed, where a state tort claim "require[s] only the purely factual inquiry into any retaliatory motive of the employer," a court is not required to find those claims to be preempted. *Hawaiian Airlines*, 512 U.S. at 266.  Thus, the first step of the preemption analysis requires a court to "recognize the essential elements of state tort law claims . . . and against the elements so identified, determine whether the state law claim can be resolved without interpreting or depending on the proper interpretation of the [CBA]." *Barbe v. Great Atl. & Pac. Tea Co., Inc.*, 722 F. Supp. 1257, 1260 (D. Md. 1989), *aff'd*, 940 F.2d 651 (4th Cir. 1991).

The state tort claims asserted by plaintiffs largely seek additional avenues for relief for most of the same nucleus of facts pertaining to racial discrimination and retaliation.  *See* ECF 4, ¶¶ 649–83.  That is, underlying each of the tort claims is the allegation that one plaintiff or a class

of plaintiffs is entitled to relief under state tort law for harms suffered as a result of racial discrimination and retaliation.  Again, the tort claims require a factual inquiry into motive.  *See Hawaiian Airlines*, 512 U.S. at 266.

Notably, the Amended Complaint contains several allegations against the Union and Union officials.  But, the Union is not a defendant.  For example, the Amended Complaint (ECF 4, ¶¶ 554, 555) alleges that the Union failed to timely grieve plaintiff Ajtiim Lee's discharge from employment.  The allegation appears within the "Facts Common to All Counts" section of the Amended Complaint.  *See id.*  It is made as the basis for a claim for relief.

The mere assertion that defendants violated the CBA is not itself a trigger for the complete preemption doctrine.  As discussed, "[t]he fact that a CBA or union constitution is 'part of the context' in which a plaintiff's claim must be addressed does not 'trigger complete preemption in the absence of some substantial dispute over the meaning of the collective bargaining agreement.'" *Casselli v. City of Phila.*, 54 F. Supp. 3d 368, 375 (E.D. Pa. 2014) (quoting *Kline*, 386 F.3d at 257).  And, the fact that plaintiffs have brought allegations of misconduct against union officials, standing on its own, similarly fails to trigger the doctrine.  *See Barbour II*, 640 F.3d at 599 (Agee, J., concurring) (quoting *Caterpillar Inc.*, 482 U.S. at 392) (observing that under the well-pleaded complaint rule, a plaintiff "'may avoid federal jurisdiction by exclusive reliance on State law'"); *Prevas*, 951 F. Supp. at 569–70 ("[T]he law is clear that the complete preemption doctrine should not be interpreted to extinguish all state-law tort claims of union members against other union members.") (noting that the plaintiff "declined to assert *any* claims against his union or against the officers of the union in their official capacity," and instead asserted torts against union officials in their individual capacities).  As indicated, these assertions are irrelevant to the claims and therefore do not trigger complete preemption.  *See Barbour v. Int'l Union*, 594 F.3d 315, 332 n.11 (4th Cir.

2010) ("*Barbour I*") (declining to apply complete preemption under § 301 because allegations contained in the fact section of the complaint "merely explained" context for the claims, and thus "did not indicate any need to analyze the terms of a collective bargaining agreement in connection" with the claims actually charged), *vacated*, 640 F.3d 599 (4th Cir. 2011) (en banc) ("*Barbour II*").

In sum, plaintiffs' state tort claims are not subject to the doctrine of complete preemption. I turn to review each claim.

### i.   Tortious Interference with Economic Relations

Plaintiffs assert that Exelon "intentionally and improperly interfered" with their future employment opportunities "by making it impossible to for other employers that have a contractual relationship with the Exelon Companies to hire them and, in some cases, inducing or requiring such contractors to withdraw offers of employment and/or to fire them." ECF 4, ¶ 651. This claim is based on Exelon's policy that an employee who is terminated for cause or poor work performance "shall not be retained to work on Exelon projects or property [as a contractor] for a period of at least five (5) years following the termination of his/her Exelon employment." ECF 4-11, Exelon Use of Contractors Policy, at 10.[11]   According to plaintiffs, this policy essentially precludes them from working for companies that do business with Exelon. ECF 4, ¶ 11. And, they claim that defendants strictly enforce this policy against Black workers, but "have routinely made exceptions in applying the Use of Contractors Policy to similarly situated White former BGE employees who were terminated for cause or for poor performance or who were permitted to

---

[11] Additionally, the policy states: "After a minimum of five (5) years, upon application or request, the Vice President of Human Resources for the applicable business unit may elect to review a former employee's eligibility for retention as a contractor on a case by case basis. Any decision regarding eligibility for rehire or retention under this provision shall be at Exelon's sole discretion." ECF 4-11 at 10.

voluntarily resign or retire in lieu of termination when they were under investigation for alleged misconduct or incompetence." *Id.* ¶ 637.

The tort of intentional interference with contractual or business relations is "well established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296, 639 A.2d 112, 116 (1994). Broadly stated, the tort imposes liability on "one not privileged to do so who purposely induces or causes a third person not to perform a contract or enter into or continue a business relation with another." *United Rental Equip. Co. v. Potts & Callahan Contracting Co.*, 231 Md. 552, 560, 191 A.2d 570, 574 (1963).

The Maryland Court of Appeals (now known as the Supreme Court of Maryland)[12] reiterated the elements of the tort in *Blondell v. Littlepage*, 413 Md. 96, 125, 991 A.2d 80, 97 (2010) (quoting *Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628–29, 831 A.2d 49, 53 (2003)), as follows:

> A claim for intentional interference with contractual or business relations requires the following elements: "(1) intentional and [willful] acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

The tort has "two general manifestations." *Macklin*, 334 Md. at 297, 639 A.2d at 117. The first manifestation is often described as "'inducing the breach of an existing contract,'" and the

---

[12] In November 2022, the Maryland electorate voted to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved changing the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately%2C%20the%20Court%20of,the%20Appellate%20Court%20of%20Maryland. However, to avoid confusion, I will refer to the names of the courts as they existed when the cited cases were decided.

second, "'more broadly, [constitutes] maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract.'"  *Blondell*, 413 Md. at 125, 991 A.2d at 97 (quoting *Kaser*, 376 Md. at 628, 831 A.2d at 53).  In other words, under Maryland law, one may claim tortious interference with a contract, or, in the absence of a contract or breach of contract, one may claim tortious interference with business or economic relations.

Notably, liability will only attach to an interference that is either "wrongful or unlawful." *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343, 605 A.2d 83, 90 (1992) (citation omitted); *see Gabaldoni v. Wash. Cnty. Hosp. Ass'n.*, 250 F.3d 255, 263 (4th Cir. 2001) (citing *Travelers*, 326 Md. at 343, 605 A.2d at 90).  The Maryland Court of Appeals has explained that "an act of tortious interference with economic relations is characterized by the defendant's specific purpose to interfere, and . . . acts which incidentally affect another's business relationship are not a sufficient basis for the tort."  *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 656, 650 A.2d 260, 270 (1994).  Although, as a general matter, "wrongful conduct is incapable of precise definition," it is well established that when a party acts within its rights, that conduct is not wrongful "as a matter of law."  *Macklin*, 334 Md. at 301–02, 639 A.2d at 119 (citing *Ronald M. Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 765, 511 A.2d 492, 498 (1986)).

Plaintiffs allege discriminatory application of Exelon's provision as to "Use of Former Exelon Employees as Contractors," which is contained in the company's "Use of Contractors" Human Resources Policy.  *See* ECF 4-11 at 9–10 ("Use of Former Exelon Employees as Contractors").  The policy states that it "applies to all employees," in addition to "all Exelon subsidiaries, affiliates or related Companies."  *Id.* at 1.  Therefore, this policy is not one that is exclusively dictated by the CBA, as it applies to all employees, regardless of union membership. Importantly, the policy states that, where it contradicts the CBA, "the provisions of such agreement

. . . shall govern." *Id.* But, because defendants did not submit a copy of the CBA, I cannot be sure that it is included in the CBA or contradicted by the CBA.

In any event, the question is whether the company-wide human resources policy is applied in a discriminatory manner, which does not require interpretation of the CBA. And, the possibility that plaintiffs "would have to resort to reference to the CBA to demonstrate wrongfulness is speculative at best." *Harless*, 389 F.3d at 450. Therefore, the claim is not preempted under § 301.

### ii.    Intentional Infliction of Emotional Distress

Plaintiff Ajtiim Lee alleges that defendants Joseph M. Belge, Robert D. Matthews, Calvin G. Butler Jr., Eric Gomez, Beth McGuire, Jennifer Herwig, Denise Galambos, Amy E. Best, William Wesley Cameron, Lexer Quanie Mayers, Anne Bancroft, and the Exelon Companies intentionally engaged in wrongful conduct toward Lee for the purpose of inflicting emotional distress or with reckless and deliberate disregard of a high degree of probability that emotional distress would result. ECF 4, ¶ 666. According to Lee, defendants caused his emotional distress based on conduct that includes intentional racial discrimination; retaliation; ignoring or failing to take appropriate action in response to Lee's complaints of racial discrimination; deliberately making false and defamatory statements regarding his job performance and discharge; improperly disclosing his confidential personnel information; and false accusations that Lee staged or fabricated the noose-tying incident. *Id.* ¶¶ 666, 667. This claim does not fall within the scope of § 301.

When a plaintiff alleges that a defendant, or agents of a defendant, committed IIED under Maryland law, the plaintiff must demonstrate that: (1) the conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Manikhi v. Mass*

*Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95, 113 (2000) (citation omitted); *accord, e.g.*, *Caldor, Inc. v. Bowden*, 330 Md. 632, 641–42, 625 A.2d 959, 963 (1993); *Mixter v. Farmer*, 215 Md. App. 536, 547–48, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

A defendant's conduct must be "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris v. Jones*, 281 Md. 560, 567, 380 A.2d 611, 614 (1977)). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59–60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)).

Generally, claims for IIED are disfavored, difficult to establish, and, as such, "rarely viable" under Maryland law. *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011); *see Arsham*, 85 F. Supp. 3d at 850; *Manikhi*, 360 Md. at 369, 758 A.2d at 114; *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also* David Crump, *Rethinking Intentional Infliction of Emotional Distress*, 25 GEO. MASON L. REV. 287, 297 (2018) (noting that an IIED claim is "a kind of vituperative epithet" that "adds little that can be the subject of a separate or additional recovery" but "makes [the litigation] more expensive"). Indeed, since the Maryland Court of Appeals first recognized the tort of IIED in 1977, *Harris*, 281 Md. 560, 380 A.2d 611, it has repeatedly advised that "recovery" for IIED "will be meted out sparingly." *Hamilton*, 66 Md. App. at 61, 502 A.2d at 1065; *see Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191, 1216

(1992); *Caldor, Inc.*, 330 Md. at 642, 625 A.2d at 963.  But, the difficulty of establishing the claim is not pertinent at this juncture.

Returning to the issue of preemption, the analysis here focuses on the second element of the IIED claim because neither "extreme" nor "outrageous" is defined in law and this determination therefore must be made on a case-by-case basis.  *See McCormick*, 934 F.2d at 535 ("'Outrageousness' for purposes of intentional infliction of emotional distress is also not an independent, nonnegotiable standard of behavior.").  Moreover, in order to determine whether the alleged conduct was wrongful, a plaintiff must demonstrate that it was wrongful *under the circumstances*.  *Id.* at 535–36.  Therefore, the key inquiry is whether the "rightness or wrongness of the action [has] been committed to the common law of tort" or to the "legal arrangements embodied in a contractual agreement."  *Id.* at 536.  That is, the question is whether the allegedly wrongful acts "directly relate[] to the terms and conditions" of the plaintiff's employment. *Douglas v. Am. Info. Techs. Corp.*, 877 F.2d 565, 573 (7th Cir. 1989).  Ultimately, the standard boils down to whether the CBA could possibly sanction the employer's conduct without contradicting superseding law or public policy.

In *McCormick*, 934 F.2d at 535, the plaintiff brought an IIED claim against his employer alleging that, when his employer cleaned out his locker after he was terminated, the employer engaged in "outrageous" conduct.  The Fourth Circuit reasoned, *id.* at 536: "The circumstances that must be considered in examining management's conduct are not merely factual, but contractual."  This is because cleaning out the discharged employee's locker is "not a matter of intrinsic moral import but a question of legal authority—whether management had the lawful right to proceed as it did."  *Id.*  Therefore, the Court could not determine whether the employer acted in

a wrongful manner without consulting the CBA to determine the existence or extent of any duty owed to the employee with regard to the locker.  *Id.* at 536–37.

The Court concluded that assessing an IIED claim "requires an inquiry into whether the actor was legally entitled to act as he or she did."  *Id.* at 537.  Because the legality of the employer's conduct depended on whether the CBA authorized it, the claim was preempted.  *Id.*

Similarly, in *Douglas*, 877 F.2d at 572, the Seventh Circuit determined that the plaintiff's claims were governed by her CBA because her IIED claim was based on her employer's denial of excused days from work and alleged unwarranted scrutiny.  The *Douglas* Court found that if the employer's conduct was authorized under the CBA, "then it would have been exercising its 'legal rights in a permissible way.'"  *Id.* (quoting *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 91, 360 N.E.2d 765, 768 (1976)).  Thus, the court was required to interpret the CBA.  It followed that the claims were preempted.

Of relevance here, a preemption analysis is only applicable where the conduct at issue complies with law and public policy.  "'Despite the considerable breadth of . . . *McCormick*' the LMRA does *not* preempt [IIED] claims that allege the distress was caused by discriminatory conduct that could not be condoned by a CBA."  *Harless*, 389 F.3d at 449 (emphasis in original) (quoting *Jackson v. Kimel*, 992 F.2d 1318, 1326 (4th Cir. 1993)).  An allegation of conduct that violates federal law, state public policy, or state criminal law is independent of a CBA and therefore cannot be preempted by § 301.  *See Jackson*, 992 F.2d at 1326.  "Basically, the employer's conduct could not be authorized and legal under the collective bargaining agreement and 'simultaneously be considered "outrageous and intolerable"'" under state law.  *Id.* (quoting *McCormick*, 934 F.2d at 537); *see also Baker v. Farmers Elec. Coop.*, 34 F.3d 274, 281 (5th Cir. 1994) ("[W]here the allegedly tortious conduct could not have been sanctioned by the CBA, for

example in cases concerning assault and battery or sexual harassment, no preemption occurs."). Thus, in *Jackson*, 992 F.2d at 1326, the Court concluded that the plaintiff's IIED claim, based on "coerced-sex-in-exchange-for-job-benefits," was wrongful regardless of whether it was authorized by the CBA, and therefore not preempted under § 301.

The Eleventh Circuit followed a similar analysis in *Lightning v. Roadway Express, Inc.*, 60 F.3d 1551 (11th Cir. 1995). There, the court determined that the plaintiff's claims—which included verbal abuse, being spat on by a supervisor, and being assaulted by a supervisor—did not "concern the terms and conditions of his employment, but rather the severe abuse he endured" from the supervisors. *Id.* at 1557. The court reasoned that the plaintiff's "'claim revolve[d] around conduct by his employer that is not even arguably sanctioned by the labor contract'" and thus did not "implicate the provisions of the collective-bargaining agreement." *Id.* (quoting *Keehr v. Consolidated Freightways of Del., Inc.*, 825 F.2d 133, 138 n.6 (7th Cir. 1987)); *see also Knafel v. Pepsi–Cola Bottlers of Akron, Inc.*, 899 F.2d 1473, 1483 (6th Cir. 1990) (stating that the plaintiff's "alleged emotional distress was . . . of the abuse she claims to have endured while employed. This tort claim . . . does not require an interpretation of the labor contract").

Moreover, the Ninth Circuit has also found that "the tort of intentional infliction of emotional distress establishes rights and duties independent of the employment relationship." *Tellez*, 817 F.2d at 539. And, the court recognized that the tort of IIED "hinges on state of mind, causation and injury," which is outside the scope of a CBA. *Id.*

Based on the foregoing, I conclude that the claims of IIED based on racial discrimination and retaliation are not preempted by § 301 of the LMRA. This is because the CBA could not legally sanction such behavior. *See Jackson*, 992 F.2d at 1326.

As for the remaining grounds asserted to support the IIED claim, interpretation of the CBA is similarly not required.  To be sure, the claims relate to the terms and conditions of employment, but those terms and conditions are contained in the Employee Handbook (ECF 4-8), Exelon Human Resources Policy (ECF 4-10; ECF 4-11), and/or the Exelon Code of Business Conduct.[13] That these company policies are included in sources other than the CBA indicates that the rights constitute general terms of employment with Exelon, rather than terms specific to unionized employees.  *See, e.g.*, ECF 26 at 11 n.3 (quoting the provisions of the Exelon Code of Business Conduct addressing Exelon's confidentiality policies).

Plaintiff Lee alleges a violation of these policies and his civil rights, rather than violations of the CBA.  ECF 4, ¶ 664 (noting within the claim for relief that "Mr. Lee's status as an employee of the Exelon Companies entitled him to a greater degree of protection from abusive conduct").  This is especially clear when looking to the Amended Complaint as a whole.  Although there is a cursory reference to CBA policies, the Amended Complaint discusses the company-wide policies in great detail.  *See id.* ¶¶ 141–52.  Additionally, Exelon's company-wide policies are attached as exhibits to the Amended Complaint (ECF 4-10; ECF 4-11).  And, as noted, neither side provided the CBA.  Because there is no CBA to review, I cannot conclude that the CBA must be interpreted in order to resolve these claims.

The determination against preemption is most tenuous with regard to plaintiff Lee's claim that defendants are liable for IIED for failing to take an appropriate response to his racial discrimination complaint, because it would seem likely that the CBA is instructive as to remedial

---

[13] Plaintiffs include a link to Exelon's Code of Business Conduct, which is publicly available on the company's website.  ECF 4, ¶ 142 n.17.

measures required by defendants.  *See* ECF 22-1.[14]  However, Exelon's Human Resources Policy

contains its own standards for Exelon companies and their employees as to remedial procedures

for racial discrimination complaints.  ECF 4-10.  Exelon's "Policy Against Harassment,

Discrimination, and Retaliation" states that it applies to "all employees of any Exelon

company . . . and all other persons who may be present in any Exelon workplace or who is

conducting business with Exelon."  *Id.* at 2.  Further, it states, *id.* (emphasis added):

> Employees at any level within Exelon who engage in harassment, discrimination,
> or retaliation will be subject to disciplinary action, up to and including immediate
> termination of employment, as determined at the Company's discretion.  *Likewise,
> executives, key managers, managers, and supervisors who are aware of any actions
> that may violate this policy and do not take appropriate steps to address those
> actions will be subject to disciplinary action, up to and including termination of
> employment Harassers, and those who fail to prevent harassment when they have
> a responsibility to do so, may also be individually subject to legal liability*.

Thus, the company-wide policy imposes certain requirements upon employees when faced

with incidents of racially motivated misconduct, and specifically requires disciplinary action when

managers or executives fail to take the appropriate steps pursuant to the policy.  There is no

indication that the CBA is at odds with the company policy.  Moreover, unlike the alleged wrongful

conduct in *McCormick*—which questioned whether cleaning out a former employee's locker was

permissible under CBA-derived rights—the racial discrimination, retaliation, and harassment

alleged in this case is "a matter of intrinsic moral import."  *McCormick*, 934 F.2d at 536.

Assuming, *arguendo*, that the conduct alleged in this matter is true, it does not appear that

defendants could have been "exercising [their] legal rights in a permissible way."  *Douglas*, 877

---

[14] I note this as "likely" because the only portion of the CBA provided to the Court is a
partially redacted table of contents.  ECF 22-1.  The Court is able to view only the portions of the
table of contents that are not redacted, which show that Article 22 of the CBA governs
"Disciplinary Actions," including Section 22.02 "Progressive Discipline," and Article 23 governs
"Grievance Procedure," including Section 23.05 "Failure to Meet/Respond."  *Id.* at 8.  But, no
information beyond the titles of the sections has been provided to the Court.

F.2d at 572 (internal quotation omitted).  This is because the Maryland Court of Appeals has held that "claims of . . . intentional infliction of emotional distress are rights that exist, under Maryland law, independent of any provision" of a labor contract.  *Batson*, 325 Md. at 721, 602 A.2d at 1210. Therefore, the IIED claim is not preempted by § 301.

### iii.    Defamation

Plaintiff Randall Carroll asserts a claim of defamation against defendant Mark Powers, a supervisor at BGE, and the Exelon Companies.  ECF 4, ¶¶ 670–76.  Carroll alleges that Powers made false statements regarding Carroll's work performance and the reasons for Carroll's discharge to coworkers and business partners "who did not have any legitimate need to know Mr. Carroll's confidential personnel information."  *Id.* ¶ 673.  According to Carroll, Powers falsely conveyed to others that Carroll stole from the company.  *Id.* ¶ 412.  This claim is not preempted by § 301.

Under Maryland law, a defamatory statement "'is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'"  *Norman v. Borison*, 418 Md. 630, 645 n.10, 17 A.3d 697, 705 n.10 (2011) (quoting *Offen v. Brenner*, 402 Md. 191, 198–99, 935 A.2d 719, 723–24 (2007)).  The tort of defamation consists of four elements: "'(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'"  *Id.* (quoting *Offen*, 402 Md. at 198–99, 935 A.2d at 723–24).

A statement is false if it is "'not substantially correct.'"  *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012) (quoting *Batson*, 325 Md. at 726, 602 A.2d at 1213).  And, the plaintiff bears the burden of establishing falsity.  *Batson*, 325 Md. at 726, 602 A.2d at 1213.[15]

The Ninth Circuit's decision in *Tellez*, 817 F.2d 536, is instructive.  The plaintiff in *Tellez* alleged that his employer defamed him when it distributed copies of a letter "maliciously and falsely accusing" plaintiff of illicit conduct.  *Id.* at 538.  The Ninth Circuit determined that the defamation claim "neither asserts rights deriving from the collective bargaining agreement, nor requires interpretation of the agreement's terms" because California's defamation law establishes "nonnegotiable rights and obligations independent of any labor contract" and "one can sue for defamation regardless of employment status or union membership."  *Id.*  Citing to *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 61 (1966), the *Tellez* Court said, 817 F.2d at 538 n.2: "Outside the Section 301 context, the Supreme Court has recognized that claims for malicious defamation are only peripherally related to the policies of the Labor Management Relations Act."

Similar to California, claims of defamation in Maryland implicate "rights that exist . . . independent" of a labor contract.  *Batson*, 325 Md. at 721, 602 A.2d at 1210.  "Consequently, these claims are not the type of claims which the *Lueck* Court would have concluded were 'inextricably intertwined with consideration of the terms of the labor contract.'"  *Id.*

---

[15] "Maryland has retained the common law distinction between defamation *per quod* and defamation *per se*."  *Sullivan v. City of Frederick*, JKB-17-1881, 2018 WL 337759, at *8 (D. Md. Jan. 9, 2018) (citing *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441, 966 A.2d 432, 448 (2009)), *aff'd*, 738 F. App'x 198 (4th Cir. 2018). "Defamation *per se* is defamation on its face— *i.e.*[,] the 'words themselves impute the defamatory character.'"  *Id.* (quoting *Metromedia, Inc. v. Hillman*, 285 Md. 161, 172, 400 A.2d 1117, 1123 (1979)).  "In the case of defamation *per quod*, extrinsic facts must be alleged in the complaint to establish the defamatory character of the words or conduct."  *Indep. Newspapers*, 407 Md. at 441–42, 966 A.2d at 448.

As plaintiffs argue (ECF 26 at 6), defendants' reliance *on Ali*, 595 F. Supp. 2d 618, is misplaced. The defamation alleged in *Ali* concerned statements made by the defendant during the course of a CBA-governed investigation of the plaintiff. *See id.* at 623. In contrast, Carroll alleges that Powers defamed him after his discharge. ECF 4, ¶ 412. Thus, *Ali* is not applicable and, for similar reasons, neither is *Willis*, 840 F.2d 254, nor *Barbe*, 722 F. Supp. 1257, *aff'd*, 940 F.2d 651. *See Evans v. Keystone Consol. Indus., Inc.*, 884 F. Supp. 1209, 1216 (C.D. Ill. 1995) (finding that, although "it appears that the vast majority of case law dealing with the question of § 301 preemption of state law defamation claims holds that when statements alleged to be defamatory are made in the context of a disciplinary or grievance-arbitration procedure established by a collective bargaining agreement, § 301 preempts the state law claim of defamation," preemption is not appropriate where the alleged defamatory statements did not occur within such a CBA-governed investigation); *see also Monsour v. Delco Remy, Plant 25, Meridian, Miss.*, 851 F. Supp. 245, 246–49 (S.D. Miss. 1994) ("Apparently, it is defendants' position that the LMRA operates to preempt any tort action, so long as the cause of action bears any relation to the workplace or to the collective bargaining agreement and occurs within the confines of the employment relationship. But in the court's opinion, the reach of the LMRA preemption falls short of the present dispute.").

In sum, the defamation claim is not "inextricably intertwined with consideration of the terms of the labor contract." *Lueck*, 471 U.S. at 213. Therefore, it is not preempted.

### iv.    Invasion of Privacy–False Light

The final state law tort claim brought in this matter, invasion of privacy–false light, again involves Carroll and Powers, and is also based on the same set of facts. Carroll alleges that Powers's "false statements regarding [his] job performance and the reason he was discharged by BGE improperly publicized information concerning [his] personal and confidential personnel

records . . . which placed him in a false light by attributing to him conduct and characteristics which were false." ECF 4, ¶ 678.  Further, Carroll claims that the Exelon Companies "ratified and affirmed Powers' invasion of [his] privacy" by failing to investigate Carroll's complaints against Powers, as well as failing to address Powers's misconduct.  *Id.* ¶ 682.

In order to establish a claim in Maryland for this tort, a plaintiff must allege that a defendant has given "publicity to a matter concerning another that places the other before the public in a false light . . . if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Chinwuba v. Larsen*, 142 Md. App. 327, 359 n.8, 790 A.2d 83, 102 n.8 (2002), *rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003); *see Furman v. Sheppard*, 130 Md. App. 67, 77, 744 A.2d 583, 587 (2000); *Bagwell*, 106 Md. App. at 514, 665 A.2d at 318; *see also Holt v. Camus*, 128 F. Supp. 2d 812, 816 (D. Md. 1999).

The Maryland Court of Appeals has said: "An allegation of false light must meet the same legal standards as an allegation of defamation."  *Piscatelli*, 424 Md. at 306, 35 A.3d at 1146–47. Therefore, the § 301 preemption analysis parallels that for defamation, described above.  *See Casselli*, 54 F. Supp. 3d at 378–79 (analyzing a plaintiff's false light claims in a manner similar to the defamation claims); *Parker v. It's a Laugh Prods.*, CV0902442GAFJCX, 2009 WL 10671983, at *5 (C.D. Cal. May 28, 2009) (same).

Relying on the analysis set forth as to defamation, I conclude that the false light tort concerns independent, substantive rights under Maryland law and is not preempted by § 301.  *See, e.g.*, *Marchese v. Birmingham*, No. CV 08-437, 2009 WL 10684921, at *5 (E.D. Pa. Feb. 13, 2009) ("Plaintiff has not alleged that Defendants violated a specific term or condition of the CBA nor

does it appear that this claim is 'founded upon [any] rights created by the CBA.'  Rather, it appears to be 'grounded in substantive rights granted under state law.' . . .  Accordingly, I find that this claim is not preempted.") (internal citations omitted); *Parker*, 2009 WL 10671983, at *5 ("For the same reasons that [plaintiff's] closely-related defamation claim is not preempted, namely, because it is unrelated to and does not require interpretation of the CBA, the Court finds [plaintiff's] invasion of privacy claim is an independent state claim not preempted by Section 301."); *Bimler v. Stop & Shop Supermarket Co.*, 965 F. Supp. 292, 301 (D. Conn. 1997) ("The plaintiff's claim of invasion of privacy is also independent of the collective bargaining agreement . . . the plaintiff's claim for invasion of privacy is based upon an alleged violation of rights under Connecticut law that are wholly separate from any agreement between Stop & Shop and the union.  Because this claim does not require the court to interpret the terms of the collective bargaining agreement, it is not preempted by Section 301 of the LMRA."); *Luecke v. Schnucks Markets, Inc.*, 85 F.3d 356, 359 (8th Cir. 1996) ("Keeping in mind the central factual inquiry—what was said to whom, whether it was false and knowingly or recklessly so, and whether damages resulted—we look to see whether an interpretation of the collective-bargaining agreement will be required in order to resolve the state claim.  The answer, on the record here, is 'no.'"); *Moder v. L.E. Meyers Co.*, 589 F. Supp. 2d 1043, 1052 (W.D. Wis. 2008) ("Preparing and distributing injurious statements about an employee that are known to be false, even if made in the context of termination proceedings, are not even arguably sanctioned by the collective bargaining agreement and do not require interpretation of its terms.  Therefore, plaintiff's defamation claims are not preempted.").

### c.   Conclusion

In sum, I disagree with defendants' contention that removal is proper on the grounds that plaintiffs' state law claims are completely preempted by § 301 of the LMRA.  However, this conclusion does not foreclose the defense of preemption in state court.  *See In re Blackwater*, 460 F.3d at 590 ("[T]he district court's finding that complete preemption did not create federal removal jurisdiction will have no preclusive effect on a subsequent state-court defense of federal preemption."); *Humble*, 305 F.3d at 1011 ("We do not discount the possibility that in the course of resolving the reasonable accommodation claim, an interpretive dispute might arise under [the CBA]. . . . However, any interpretation of the CBA's provisions in the present case is only potential and limited."); *see also Caterpillar Inc*., 482 U.S. at 397–98 (finding that a claim that is not subject to federal jurisdiction under the complete preemption doctrine may nevertheless be proven preempted when the state court reaches the merits).

### B.  Section 9(a) of the NRLA

Defendants argue that plaintiffs raise duty of fair representation claims in several paragraphs of the Amended Complaint, and that these claims are subject to the doctrine of complete preemption.  ECF 1, ¶¶ 19–20.  In particular, defendants cite to ¶¶ 53, 86, 160, 235, 236, 238, 393, 394, 396, 399, 400, 401, 402, 403, 404, 554, 555 of the Amended Complaint.  ECF 1, ¶ 7.  According to defendants, plaintiffs' "allegations against Kasecamp and Gomez," who are both union representatives, "plainly constitute duty of fair representation claims as a matter of law."  ECF 22 at 23–24.  Again, I disagree.

In contrast to § 301 of the LMRA, the Supreme Court has not ruled that § 9(a) of the NLRA is subject to the doctrine of complete preemption.  Indeed, the Supreme Court has declined to reach this issue when presented with the opportunity.  *See Rawson*, 495 U.S. at 377 (Kennedy, J.,

dissenting) ("The Court accepts the Union's contentions with respect to § 301 and does not reach the issue of pre-emption by the duty of fair representation.").

To my knowledge, the Fourth Circuit has not made a determinative ruling on this question. *See Barbour I*, 594 F.3d 315.  In *Barbour I*, 594 F.3d at 316–317, plaintiff-retirees filed suit in state court, charging their union with providing "false information regarding their eligibility to receive retirement incentive packages."  The union removed the case to federal court on the basis that the claims derived from the § 9(a) duty of fair representation and the district court determined that those claims were completely preempted.  *Id.* at 318, 326.

A panel of the Fourth Circuit affirmed in part, vacated in part, and remanded to the district court with instructions to remand the case to the Maryland state court.  *Id.* at 333.  Of relevance here, the Court determined that the district court lacked subject matter jurisdiction "because complete preemption is not present in this case."  *Id.* at 326.  The Court stated, *id.* at 328: "Although the [union's] claim that the duty of fair representation may be a defense of federal law to the Retirees' claims, it is a defense of ordinary preemption and not a case where Congress has clearly and unequivocally 'displaced any state cause of action.'"

But, *Barbour I* was reheard *en banc* and, in *Barbour II*, 640 F.3d at 604, the *en banc* Court vacated the panel decision.  Unlike *Barbour I*, the *Barbour II* Court did not reach the preemption question because it remanded the case to state court on other grounds.  *See id.* at 602.

Defendants maintain that the "vacated panel decision [in *Barbour I*] is not citable authority."  ECF 22 at 21.  To be sure, *Barbour I* does not have binding precedential force. Nonetheless, it provides guidance in analyzing whether the claims in this case invoke the doctrine of complete preemption—an issue not reached in *Barbour II*.

The panel determined in *Barbour I*, 594 F.3d at 332 (quoting *Beneficial*, 539 U.S. at 8), that it could not conclude "that § 9(a) of the NLRA 'wholly displaces' every state law cause of action," and it declined to apply the doctrine of complete preemption on that ground. The Court explained, *id.* at 329 (quoting *Lontz*, 413 F.3d at 441) (emphasis in original):

> [F]or complete preemption to apply, it is not sufficient for a defendant to show the plaintiff's state law claim could have been made as a federal law claim. Otherwise, the well-pleaded complaint rule would be turned on its head and removal jurisdiction would explode exponentially. Instead, a removing defendant must show not only that the defendants' state law claim is cognizable as a federal claim, but that the Congress clearly intended the federal claim to "'provide *the exclusive* cause of action' for claims of overwhelming national interest."

Ultimately, the *Barbour I* Court was "not convinced" that the "'manifestation of congressional will' with respect to the § 9(a) duty of fair representation applies with the same clarity as under § 301 of the LMRA." *Id.* at 332. The Court emphasized that "any reasonable doubts must be resolved against complete preemption." *Id.* (citing *Lontz*, 413 F.3d at 441).

In holding as such, the *Barbour I* Court explicitly rejected First and Fifth Circuit precedent to the contrary. Specifically, *Barbour I* found *Richardson v. United Steelworkers of Am.*, 864 F.2d 1162 (5th Cir. 1989), to be inapposite, because the plaintiffs in *Richardson* "'did not allege any breach of a state tort duty that exists independently of the NLRA-established collective bargaining relationship.'" *Barbour I*, 594 F.3d at 331 (quoting *Richardson*, 864 F.2d at 1167). In contrast to the *Richardson* plaintiffs, the *Barbour I* plaintiffs alleged a claim of negligent misrepresentation against a union, involving "'an independent state-law duty of care arising simply from the relationship of a union to its members.'" *Id.* (quoting *Richardson*, 864 F.2d at 1167). The *Barbour I* Court determined that *Richardson* actually supported a finding against complete preemption in its case. *Id.*

And, the *Barbour I* Court also expressly rejected the First Circuit's holding in *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers of Am.*, 132 F.3d 824, 831

(1st Cir. 1997), that "[duty of fair representation] preemption operates in much the same fashion as section 301 preemption." The *Barbour I* Court was unpersuaded by *BIW Deceived* because the First Circuit found an implication of complete preemption "without citation to the text of the statute or any of its legislative history." *Barbour I*, 594 F.3d at 332. This contravened the obligation to strictly construe removal jurisdiction based on a clear statement of congressional intent. *Id.*

Defendants contend (ECF 22 at 22) that the "correct governing standard . . . is clearly expressed in Judge Gallagher's decision in *Alston I*," 2020 WL 6684623, at *5. In that case, Alston was the sole plaintiff, and he brought claims directly against the Union and the Union shop steward, Patrick Gilden, in his official capacity. In contrast, neither the Union nor Gilden is named as a defendant in this case.

In *Alston I*, Judge Gallagher observed: "Numerous district courts, including several in this district, have held that fair representation claims under state law are completely preempted." *Id.* at *5. But, *Alston I*, along with the other cases cited by defendants for the same proposition, is entirely distinguishable from *Alston II*. In those cases, a breach of the duty of fair representation was stated on the face of the complaint and/or a union was named as a defendant. *See generally id.*; *Marable v. D.P.I. Specialty Foods Mid Atl., Inc.*, DKC-19-2809, 2020 WL 4569522 (D. Md. Aug. 7, 2020); *Whorton v. Mack Trucks, Inc.*, CCB-19-413, 2019 WL 7049933 (D. Md. Dec. 23, 2019); *Ngamby v. Hamburg*, TDC-15-0931, 2015 WL 6674148 (D. Md. Oct. 29, 2015); *Taylor v. Giant Food, Inc.*, 438 F. Supp. 2d 576 (D. Md. 2006). These cases do not address whether a court may evade the well-pleaded complaint rule to infer § 9(a) claims, as has been expressly determined and thoroughly adjudicated by the Supreme Court with regard to § 301 of the LMRA. In fact, in *Alston I*, 2020 WL 6684623, at *5, Judge Gallagher determined that *Barbour I* was not on point because it did not involve an express claim of duty of fair representation, whereas *Alston I* did.

Significantly, the case *sub judice* does not include an explicit claim of breach and, as noted, the Union is not a defendant.  Therefore, the cases cited by defendants are not instructive.  *See Barbour I*, 594 F.3d at 328 n.10 (finding that *Taylor v. Giant Food Inc.*, 438 F. Supp. 2d 576, was "inapposite to the case at bar" and had "no application" because the plaintiffs in that case "specifically pled 'breach of duty of fair representation,'" but the *Barbour I* plaintiffs did not).

As the *Barbour I* Court expressly emphasized, courts within the Fourth Circuit are obligated to strictly construe removal jurisdiction and, where there is doubt as to jurisdiction, the doubt "must be resolved against complete preemption." *Barbour I*, 594 F.3d at 332 (quoting *Lontz*, 413 F.3d at 441).  To rebut this presumption against preemption, defendants were required to show that Congress intended to extinguish the state-law claim when it enacted the NLRA.  *See Skidmore*, 1 F.4th at 212.  "This requires a showing that: (1) the preempting statute displays a clear congressional intent to 'entirely displace' state law; and (2) the preempting statute creates an exclusive federal cause of action in an area of 'overwhelming national interest.'"  *Id.* (quoting *Lontz*, 413 F.3d at 441).  Defendants cited the decisions of other courts within this district, discussed above, but the argument was devoid of reference to any congressional intent with respect to § 9(a) of the NLRA.

Based on the lack of binding precedent on the question of § 9(a) preemption, combined with the Fourth Circuit's rejection of the doctrine in a comparable case, I have significant doubts as to the Court's jurisdiction.  As a result, I reject defendants' assertion of complete preemption based on § 9(a) of the NRLA.

Even assuming, *arguendo*, that the doctrine does apply to § 9(a), which would allow the Court to evade the well-pleaded complaint rule, I am not persuaded that the claims in this case are fairly construed as fair representation claims under the statute.  As discussed at length above,

allegations asserted in the factual background of the Amended Complaint do not automatically trigger the complete preemption doctrine where the same allegations are not brought as claims for relief.  The Amended Complaint charges Kasecamp and Gomez with harassment, discrimination, and retaliation in violation of FEPA, and charges Gomez with IIED.  *See* ECF 4 (Counts I–III, Count VI).  But, on the face of the Amended Complaint, there is no duty of fair representation claim.

In sum, I am doubtful that complete preemption applies to claims that may, but do not explicitly, invoke the duty of fair representation.  Thus, I must apply a presumption against preemption.  *See Lontz*, 413 F.3d at 441; *Mulcahey*, 29 F.3d at 151 ("If federal jurisdiction is doubtful, a remand is necessary.").  And, in any event, I am not convinced that the claims asserted in the Amended Complaint allege a breach of the duty of fair representation, even if there were clear indications that complete preemption applied with the same force as § 301 of the LMRA. Therefore, I do not find a ground for removal on this basis.

## IV.    Attorneys' Fees

In addition to their request that this matter be remanded to state court, plaintiffs also ask the Court to award attorneys' fees incurred as a result of the removal, pursuant to 28 U.S.C. § 1447(c).  ECF 18 at 20.  Plaintiffs contend that there was "no objectively reasonable basis for removal since there is no federal claim on the face of the Amended Complaint" and removal was "contrary to settled law."  *Id.*  Further, they argue that defendants removed the case to federal court as a delay tactic.  *Id.*

As both plaintiffs and defendants have acknowledged, there is a high bar for obtaining attorneys' fees in regard to litigation concerning removal.  *See id*; ECF 22 at 29.  The Supreme Court has dictated that, "[a]bsent unusual circumstances, courts may award attorney's fees under

§ 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). "Conversely, when an objectively reasonable basis exists, fees should be denied." *Id.* A decision to grant attorneys' fees lies within this Court's discretion. *Id.*

It is unquestionable that there are certain costs and risks that arise in the course of the adversarial process. "[A] plaintiff has every right to do all that is possible, within the bounds of ethical constraints, to ensure that his case remains in state court; a defendant has an equally defensible privilege to do all it can, under like constraints, to push or pull the action into federal court." *Sledz v. Flintkote Co.*, 209 F. Supp. 2d 559, 564 (denying a request for attorneys' fees under § 1447(c) despite concluding that removal was improper).

Despite plaintiffs' suggestion that the timing of removal supports their inference that defendants did so "solely to delay the resolution of the case in state court," (ECF 18 at 20), defendants "acted within the statutorily required time limits for removal." *Common Cause v. Lewis*, 956 F.3d 246, 257 (4th Cir. 2020) (upholding district court's decision to decline to award attorneys' fees). Indeed, defendants had a statutory right to remove the matter within 30 days after service of the Amended Complaint, *see* 28 U.S.C. § 1446(b)(3), and filed the Notice of Removal on the 21st day. *See generally* ECF 1 (filed on April 29, 2022); ¶¶ 3–4 (noting that plaintiffs filed, and defendants received, the Amended Complaint on April 8, 2022).[16]

---

[16] It is plaintiffs, not defendants, who have made untimely filings. As I noted in my previous Memorandum, "by the time plaintiffs filed their Motion to Stay, their response to the Motion to Dismiss was 17 days overdue." ECF 23 at 6 (denying defendants' motion to rescind). In the exercise of my discretion, I excused the error. Thereafter, plaintiffs untimely filed the reply brief in support of the Remand Motion. *See* ECF 25 (acknowledging that plaintiffs had until August 8, 2022, to file a reply and requesting leave to file a reply brief on August 18, 2022). Yet again, I exercised discretion to consider plaintiffs' untimely filing, in the interest of resolving this dispute based on comprehensive briefing.

Moreover, my review demonstrates that the issues presented by the removal cannot fairly be characterized as "objectively" lacking reasonable basis. Although I ultimately determined that removal was improper, that conclusion was not, as plaintiffs appear to contend, so obvious as to permit sanctions. Indeed, it is the attorneys' fee motion that borders on frivolous.

In general, courts have found that "[t]he principles for deciding when a state-law claim is preempted by the LMRA are more easily expressed than applied." *Foy*, 127 F.3d at 233. It is also plaintiffs who repeatedly referenced the CBA and the Union throughout the Amended Complaint, without any necessity, thereby complicating the analysis and clouding the issues pled. Therefore, I categorically disagree with plaintiffs' assertion that the law governing complete preemption was so clear as to render defendants' removal unfair.

"The appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party," but the Court must also avoid "undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Martin*, 546 U.S. at 140. It is with this in mind that I decline to award attorneys' fees to plaintiffs.

## V.      Conclusion

For the reasons stated above, I conclude that the case was not properly removed to federal court. Therefore, the case must be remanded to the Circuit Court for Baltimore City, pursuant to 28 U.S.C. § 1447(c). However, I decline to award attorneys' fees to plaintiffs in connection with

---

It is troubling that plaintiffs ask the Court to impose sanctions on defendants for an alleged delay tactic, when it is plaintiffs who have exceeded their deadlines on more than one occasion. And, it is plaintiffs who have thus far benefitted from the Court's discretion to consider these late filings.

the removal.  And, in view of the foregoing, I decline to consider defendants' partial motion to

dismiss (ECF 16).  It must be resolved in the appropriate forum.

An Order follows.


Date:  February 1, 2023                              _____/s/_____

                                                     Ellen L. Hollander
                                                     United States District Judge